**In re KOREAN AIR LINES DISASTER OF SEPTEMBER 1, 1983.**

**MDL No. 565.**
**Misc. No. 83–0345.**

United States District Court,
District of Columbia.

Nov. 7, 1988.

Daniel M. Kolko, Milton G. Sincoff and Steven R. Pounian, Kreindler & Kreindler, New York City, N.Y., for plaintiff.

Donald Madole, Speiser, Krause & Madole, Washington, D.C., for plaintiff.

George N. Tompkins, Jr., Condon & Forsyth, Washington, D.C., New York City, for defendant.

### MEMORANDUM

AUBREY E. ROBINSON, Jr., Chief Judge.

On September 1, 1983, 269 persons aboard Korean Air Lines Flight 007 ("KE 007") tragically died while en route from New York to Seoul, South Korea. The first leg of the trip—from New York to Anchorage, Alaska—was uneventful; but during the trip from Anchorage to Seoul the flight strayed off-course into Soviet airspace, and Soviet military aircraft shot it down over the Sea of Japan. Many of decedents' representatives filed suits against several defendants; as a result of prior decisions of this Court, Korean Air Lines ("KAL") is the sole remaining defendant.[1]

---

1. *See In re Korean Air Lines Disaster of September 1, 1983,* 646 F.Supp. 30 (D.D.C.1986) (dismissing claims against United States); *In re* *Korean Air Lines Disaster of September 1, 1983,* MDL No. 565, slip op. (D.D.C. Aug. 2, 1985) [1985 WL 9447] (dismissing claims against Boe-

Currently before the Court are two motions which have been brought by KAL. First, KAL has moved for partial summary judgment dismissing plaintiffs' complaints insofar as they seek damages against KAL in excess of $75,000 for each passenger death. The second motion seeks to strike plaintiffs' jury demands. For the reasons that follow, both motions are denied.

## THE MOTION FOR PARTIAL SUMMARY JUDGMENT

■ This Court has already held that KAL may avail itself of the limitation on damages established by the Warsaw Convention.[2] *In re Korean Air Lines Disaster of September 1, 1983*, 664 F.Supp. 1463 (D.D.C.1985), *aff'd*, 829 F.2d 1171 (D.C.Cir. 1987). The Warsaw Convention limits an air carrier's liability to $75,000 for each passenger death unless the carrier is guilty of willful misconduct.[3] Thus the issue is whether KAL has established that Plaintiffs will not be able to adduce sufficient evidence to support a finding that KAL was guilty of willful misconduct in conducting the fateful flight.

Two venerable decisions from this Circuit have produced an established, yet alternatively stated, definition of willful misconduct. *See Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines Holland v. Tuller*, 292 F.2d 775 (D.D.C. 1961) (hereinafter *KLM v. Tuller*); *American Airlines, Inc. v. Ulen*, 186 F.2d 529 (D.C.Cir.1949). In *KLM*, the court defined willful misconduct as meaning "the intentional performance of an act [or failure to act] with knowledge that the act will probably result in injury or damage, or in some manner as to imply reckless disregard of the consequences of its performance, [or] a deliberate purpose not to discharge some duty necessary to safety." *KLM v. Tuller*, 292 F.2d at 778; *see also Butler v. Aeromexico*, 774 F.2d 429, 430 (11th Cir.1985) (quoting *KLM*)

Despite these various formulations there are several factors that are constant: the wrongdoer must consciously be aware of his wrongdoing, *i.e.*, the actor must not only intend to do the act found to be wrongful but also must know that his conduct is wrongful; he or she must consciously be aware that his or her wrongdoing entails a probable risk of danger; and his or her wrongdoing must cause the injuries for which recovery is sought. As is apparent, however, both by the nature of the problem of proving an actor's intent and by the formulation equating a "reckless disregard of the consequences" with intentional wrongdoing, the actor's intent may be inferred from indirect evidence and the reckless nature of his acts.

Parsing the definition into elements, then, it can be said that a claim for willful misconduct within the meaning of Article 25 of the Warsaw Convention has three essential elements:

One, an intentional act or omission done with the conscious awareness that such an act or omission was wrongful; two, an awareness of the probable consequences of the act or omission; and three, a causal relationship between the act or omission and the injury sustained.

*See Rashap v. American Airlines, Inc.*, 1955 U.S.Av.R. 593, 605 (S.D.N.Y.1955).

Procedurally, KAL, as the party moving for summary judgment, has both the initial burden of production and the ultimate burden of persuasion. Initially, it must pinpoint for the court those portions of the record it asserts establishes that there is

---

ing and Litton); *In re Korean Air Lines Disaster of September 1, 1983*, 597 F.Supp. 619 (D.D.C. 1984) (dismissing claims against Jeppesen Sanderson, Inc.)

**2.** Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted in* 49 U.S.C. app. § 1502 note (1982).

**3.** The Warsaw Convention provides:

The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his willful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

Warsaw Convention, Art. 25, 49 Stat. 3020, *reprinted in*, 49 U.S.C. app. § 1502 note at 1228 (1982).

no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law; *i.e.,* it must make a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting).[4] The nonmoving party, here Plaintiffs, must then designate, by reference to the evidentiary materials listed in Rule 56(c)—depositions, answers to interrogatories, admissions on file and affidavits [5]—"specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (quoting F.R.C. P. 56(e)). In the end, the moving party must carry its burden of persuasion, which has been characterized as a "stringent one." *Id.* at 330 n. 2, 106 S.Ct. at 2557 n. 2 (Brennan, J., dissenting):

> Summary judgment should not be granted unless it is clear that a trial is unnecessary, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party.... "[I]f ... there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment."

**4.** For an excellent discussion of the procedural steps in a motion for summary judgment, see *Celotex Corp. v. Catrett,* 477 U.S. 317, 329–34, 106 S.Ct. 2548, 2556–59, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting). Although Justice Brennan was in dissent, it is clear that his analysis of the proper procedure for summary judgment was not different than the Court's opinion. *See id.* at 334, 106 S.Ct. at 2559; *compare id.* at 329–34, 106 S.Ct. at 2556–59 *with id.* at 322–25, 106 S.Ct. at 2552–53.

**5.** The party opposing summary judgment may not rest entirely on its pleadings to establish the existence of a genuine dispute as to a material fact. Plaintiffs have not, of course, done this, but instead have supported their opposition with affidavits and deposition testimony.

**6.** In the initial motion papers this theory was understated somewhat and submitted in the alternative. Subsequently, after a deposition of a KAL pilot confirmed this hypothesis by, *inter alia,* providing the motivation to continue the flight rather than temporarily aborting the flight, Plaintiffs concentrated on this theory as

*Id.* (citations omitted) (quoting *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 258 (3rd Cir.1983), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

KAL has attempted to show that Plaintiffs' evidence is insufficient, as a matter of law, to establish that KAL was guilty of willful misconduct. As Plaintiffs will bear the burden of proving at trial KAL's willful misconduct, in order to recover damages greater than $75,000, if Plaintiffs' proof on any element necessary to establish willful misconduct is indeed inadequate as a matter of law, then KAL is entitled to summary judgment. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Giving Plaintiffs the benefit of all reasonable doubts, however, as the Court must do at this stage of the litigation, their evidence is capable of permissible inferences that would establish each and every necessary element of willful misconduct.

Plaintiffs' primary theory,[6] advanced primarily by two expert witnesses who have submitted affidavits on their behalf, is that the crew of KE 007 knew early on that, because of crew error prior to take-off, they were operating without a reliable Inertia Navigation System ("INS"),[7] the primary means of navigating the flight. In-

the most likely scenario. The Court will likewise concentrate on this theory, but will make reference to the alternative theory—essentially a gross failure of the crew to monitor their course direction—where appropriate.

**7.** The INS is a navigational device consisting of three units: a mode selector and a control display, both in the cockpit, and an inertial navigation unit containing inertial sensors and a computer to perform navigational computations. The INS allows the pilot to store flight plans of up to nine waypoints and will display, among other data, the following items: true heading and drift angle, present position, waypoint positions, distance and time to next waypoints, desired track angle, and waypoint numbers establishing present course. The INS also provides steering commands to the autopilot for automatic flight control. Plaintiffs' Exhibit A, Glossary of Aviation Terms. Flight KE 007 was equipped with three INS units. Plaintiffs' Exhibit S, ICAO Report at 11, ¶ 1.6.1.5.

stead of temporarily aborting the flight, however, to reprogram the INS, the crew decided to navigate the flight without the benefit of a reliable INS. This decision, in clear contravention of established procedures, was made to conceal their initial error that caused the INS to be either misprogrammed or misaligned. If they aborted the flight to correct their error, they would have had to dump fuel; and other KAL pilots have been disciplined for having to take such action.

Plaintiffs' experts have claimed that they have been able to simulate the most probable course of KE 007 on the night it was shot down. This determination was based on their review of the available F.A.A., United States military,[8] U.S.S.R. and Japanese radar data, the estimated location of wreckage, the wind reports of KE 007, and the crew's inability to directly communicate with various air traffic control facilities. KAL has failed to mount a sufficient attack on the evidentiary support for the expert's conclusion as to the most probable course. Although KAL asserts that there is no evidence as to the most probable course, this is insufficient, in light of Plaintiffs' witnesses' conclusions to the contrary. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 332–33, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) ("if the record disclose[s] that the moving party ha[s] overlooked a witness who would provide relevant testimony for the nonmoving party at trial, the court [cannot] find that the moving party ha[s] discharged its initial burden of production unless the moving party ... demonstrate[s] the inadequacy of this witness' testimony."). All this shows is that there is a difference of opinion as to whether a most probable course can be charted. There is nothing in the record establishing that the evidence relied upon by Plaintiffs' witnesses to formulate their opinion as to the most probable course is insufficient, as a matter of law, to support such an opinion.[9] Thus, the

---

**8.** In a prior opinion in this case, *In re Korean Air Lines Disaster of September 1, 1983,* 646 F.Supp. 30 (D.D.C.1986), in which the Court granted summary judgment for the United States on Plaintiffs' claims of negligence, the Court refused to consider the possibility of the availability of a military radar site at King Salmon, Alaska, as presenting issues of material fact. 646 F.Supp. at 32 & n. 2. Although the Court noted that this radar "was uncertified for air traffic use due to position errors[,]" *id.* at 32 n. 2, a more compelling reason for rejecting it as creating a disputed issue of material fact was that "even if it were available to the air traffic controllers on August 31, September 1, 1983, they were instructed not to use it." *Id.* As this discussion was related to whether there was an issue of fact as to the liability of the air traffic controllers to provide their services with due care, *see id.* at 31–32, it is clear that the availability of the radar site was immaterial. The air traffic controllers could not be guilty of negligence for failing to use radar they were instructed not to use.

Here, by contrast, the reliability of the radar site for use by air traffic controllers is not the issue; the key here is whether the expert's opinion as to the most probable course of flight KE 007 has evidentiary support. As discussed in the text, there is nothing in this record to suggest that the materials relied upon by Plaintiffs' witnesses', including the military radar data, are insufficiently reliable, as a matter of law, to be the basis of an opinion as to the most probable course.

**9.** Even the sources relied upon by KAL to support its assertion that no evidence exists as to KE 007's most probable course agree that there is enough evidence to indicate that the flight made a substantial deviation from its planned course. Indeed, the International Civil Aviation Organization Report ("ICAO Report"), cited to by KAL, concluded that KE 007 "continued along the same general off-track flight path for some five hours and twenty-six minutes." ICAO Report at 1, KAL Exhibit A. Similarly, the Air Navigation Commission Report ("ANC Report") concluded that there was a "significant deviation from track[,] [t]he magnitude of [which] cannot be explained." Exhibit B, ANC Report at 14. The citations to these two reports to support KAL's assertion that there is insufficient evidence to plot a most probable course are somewhat unclear, as neither, at least in the portions cited to, refer to attempts to simulate a probable flight path or whether there was sufficient evidence to do so. Even if they did conclude that there was insufficient evidence to do so, this conclusion should be read with their conclusions as to the deviation they found to exist. For example, it is hard to conclude that the ICAO Report definitively establishes that a most probable course could not be determined in light of its conclusion that there was enough evidence to determine that the flight had been off course for over five hours. *E.g.,* Plaintiffs' Exhibit S, ICAO Report at 55 ¶¶ f, g. ("This deviation resulted in a progressively ever greater lateral displacement to the right ... for some five hours").

court is amply justified in concluding, at this stage, that Plaintiffs' witnesses' testimony as to the most probable course flown would be admissible.[10]

Rather than focusing on invalidating Plaintiffs' evidentiary support for their witnesses' determination as to the most probable course flown by KE 007,[11] KAL has concentrated on attacking the inferences drawn by the witnesses as to the cause of the substantial deviation from the planned course represented by the most probable course simulated by Plaintiffs. More particularly, KAL asserts that the only inference that can be drawn from the "assumed deviation" is that the crew was negligent in failing to notice their deviation and take corrective action. The Court disagrees. A failure to notice that the flight was off-course at point A, *or* point B, *or* Point C, etc. indeed may be evidence only of negligence; but a failure to notice that the flight was off-course at point A *and* point B *and* Point C, etc. is susceptible to a different interpretation—that the crew was aware of its deviation but elected not to report it and take corrective action. The magnitude and duration of the deviation alleged here supports the inference that the crew realized its deviation some time prior to its last position report but nevertheless continued the flight and continued to report being on-course. The evidence as to the cause of the deviation supports the inference that such knowledge was sooner rather than later, because the alleged cause itself provided early and continuous indications of the deviation, the alleged cause provided a basis for the false reports, and the alleged cause provides an explanation for the crew's decision to conceal their error rather than simply correct it—the only appropriate action sufficient to correct the alleged cause and allow the flight to return to its assigned course would have subjected the crew to disciplinary action.

As alluded to above, Plaintiffs attribute the deviation from course to the crew's failure to program the Inertia Navigation

The only other source to support its assertion that no evidence exists as to KE 007's most probable course is the deposition testimony of James Richard Nelson, who apparently was a member of the Air Navigation Commission that reviewed the ICAO Report. Mr. Nelson did state that he did not have sufficient information to allow him to say what was the most probable flight path of KE 007. KAL Exhibit C, Deposition Testimony of James Richard Nelson at 77–78. But this simply means that he and Plaintiffs' witnesses disagree as to whether there is enough evidence to simulate a most probable flight path.

**10.** Because Plaintiffs have structured their theory around their most probable course scenario, the Court has focused its examination of Plaintiffs' evidence on this scenario. But given the ICAO Report's conclusions it is likely that Plaintiffs will not have to establish the "most probable course", as long as they can establish that the flight was off course to the extent necessary to support their conclusions. For example, even if there is not enough evidence of the most probable course, if there is sufficient evidence that the crew was off-course at the required checkpoints and that the crew therefore must have known of their deviation at such points (and there is such evidence), the inferences Plaintiffs suggest would still be available to the factfinder.

**11.** Perhaps a few comments on the sufficiency of Plaintiffs' affidavits are in order. Rule 56(e) requires that "opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." F.R.C.P. 56(e). With respect to Plaintiffs' witnesses' conclusion as to the most probable course, Rule 56(e) is satisfied. As a general matter, this Rule appears directed to insuring that affiant's averments, if reduced to testimony, would be admissible. Thus, despite the rule's emphasis on "facts," it is clear that opinions in an affidavit can be considered by the Court in determining a summary judgment motion, as long as the affiant sets forth the facts, which must be admissible in evidence, upon which his opinion is based, and it "affirmatively" appears that the affiant is competent to give the opinion testimony set forth in his affidavit. The affiants have set forth the facts which formed the basis of their opinions, all of which appear at this stage (KAL has not argued otherwise) to be admissible in evidence; and the affiants appear competent to testify on the matter. Both are highly experienced pilots, and one of them, Frank L. Houston, served as a consultant to the International Civil Aviation Organization, the body charged with conducting the investigation of the KAL flight 7 disaster. The "personal knowledge" requirement is satisfied by affiants' competency to testify and their personal familiarity with the record evidence supporting their conclusions. *See also* F.R.E. 701, 702, 703 (opinion testimony by lay and expert witnesses).

System ("INS") properly or by moving the airplane while it was at the Anchorage airport before the INS had "aligned." *See* Affidavit of Frank L. Houston at 16–17, Plaintiffs' Exhibit B. A malfunction in the INS system should have been apparent soon after take-off; even if not noticed pursuant to the warning system built into the INS system (if misalignment occurred), cross-checking the data received with the flight plan or with data received from other navigational equipment should have alerted the crew that the INS system was not working properly and that they were off-course. Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 17; Plaintiffs' Exhibit C, Affidavit of James Sampair at 12. Once on notice that the INS system was not reliable, the crew had a duty to return to Anchorage or seek permission to land at a U.S. military base near their route. But rather than taking corrective action the crew consciously elected to attempt to navigate the flight without a reliable INS system, in clear violation of proper piloting procedure.[12]

Clearly, whether there is sufficient evidence for a conclusion that the KE 007 crew knew that their INS system was unreliable is crucial.[13] The Court finds that there is sufficient evidence.

Before examining the evidence in support of Plaintiffs' theory, the Court will briefly address KAL's general attempt to discredit this theory. In its reply, KAL states that 1) there is no evidence to indicate whether or not the INS was functioning properly or improperly, and 2) there is no evidence that the alleged misprogramming or improper alignment of the INS was deliberate. Reply Affidavit of George N. Tompkins, Jr. at 8, ¶ 10; Reply Memorandum at 14 n. 4. The first claim is clearly erroneous. The second misses the mark.

There is no dispute that the initial leg of the flight, from New York to Anchorage, was uneventful and that the INS was operating properly. Following the New York to Anchorage leg, the INS was checked and found to be accurate and in working order. Plaintiffs' Opposition to Motion for Partial Summary Judgment at 6 n. 8; Plaintiffs' Exhibit I, Deposition Testimony of Myong–Ok So at 85; Plaintiffs' Exhibit J, Deposition Testimony of Taek–Yong Choi at 257–58; Plaintiffs' Exhibit H, Deposition Testimony of Il–Kyu Park at 33–34. This is a sufficient evidentiary basis to support an inference that the systems did not malfunction.[14]

Plaintiffs do not argue, and the law does not require, that the crew must have *intentionally* misprogrammed or misaligned the INS system. It is not the nature of the initial error that is alleged to constitute the

---

12. It is undisputed that the INS system was the primary means of navigating the planned flight route, and that if the crew realized that two of the three INS's were not functioning properly the crew was required to report the problem and abort the flight. Houston Affidavit, Ex. B at 14; Sampair Affidavit, Ex C at 13. KAL does not dispute that the INS system was the primary means of navigating the planned flight route; in fact it relies on the primacy of the INS system to support its assertion that a failure to cross-check the system with other navigational aids does not constitute a violation of required procedures, only of customary procedures. *See* Reply Memorandum in Support of Motion for Partial Summary Judgment at 13. Nowhere does it appear that KAL disputes that if the crew was aware that the INS system was not functioning they were required to abort the flight. *But see* note 19 *infra*. Of course, KAL disputes that there is evidence that the crew was aware of an INS failure.

13. Alternatively, Plaintiffs argue that the assumed deviation could not have occurred if the INS was reliable unless the crew failed to utilize the system and available cross-checks virtually completely.

14. Indeed the ICAO Report concluded that the possibility of a failure of all three INS systems must be regarded as "extremely remote," and did not find any evidence of any major instrumentation failure. ICAO Report at 37, ¶ 2.7, Plaintiffs' Exhibit S.

It should also be remembered that KAL bears the burden of persuading the Court that there is an absence of a genuine issue of material fact. Plaintiffs do not have to negate every theoretical possibility (e.g., an undetected INS malfunction that misled the crew) that could absolve KAL of wrongdoing. Nor do Plaintiffs have to presently prove their theory by a preponderance of the evidence. It is enough for Plaintiffs if the theory they present has enough evidentiary support that the conclusions they draw cannot be considered unreasonable as a matter of law.

willful misconduct; it is the failure to take corrective action when it became apparent that the INS system had been misprogrammed or misaligned. That is, Plaintiffs allege that it was the decision to continue the flight after they must have noticed that the INS system was not reliable that constitutes willful misconduct. Thus, that the initial misprogramming was inadvertent does not negate this charge.

Of course, this still leaves the question of whether there is enough support for the conclusions that the crew misprogrammed or misaligned the INS systems and knew, sometime after takeoff, that an error had been made but nevertheless decided to continue the flight. First, a programming error of ten percent would be consistent with the most probable flight path formulated by Plaintiffs' affiants. Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 16. The ICAO Report also concluded that a ten percent error in programming of the INS system could have produced the significant track deviation they determined to have existed. ICAO Report at 56, KAL's Exhibit A.

Second, the duration and magnitude of the course deviation and Plaintiffs' evidence that the crew must have known it was off-course support the inference that the crew knew early on that they had misprogrammed or misaligned the INS. According to Plaintiffs, use of ground based

navigational aids and of ground mapping radar in the plane and the crew's inability to communicate directly with air traffic control centers along the route [15] would have revealed to the crew early and often that it was off-track.

Plaintiffs' witnesses contend that if the INS system was either improperly programmed or improperly aligned, the error would have been apparent within an hour of take-off. Indeed, they assert that such errors should have been noticed prior to take-off, unless the crew failed to perform mandatory pre-flight cross-checks or ignored a warning light that would have come on if misalignment had occurred. After take-off, Plaintiffs assert, the error "would have become obvious early during the flight," Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 17, because the distance and time information and present position data indicated by the INS would have been contrary to the flight plan. *Id.;* Plaintiffs' Exhibit C, Affidavit of James C. Sampair at 12–13.

Plaintiffs contend that cross-checking the INS with three ground based navigational aids [16]—at waypoints BETHEL, NABIE and NEEVA—would have alerted the crew that it was off-course. With respect to the first of these waypoints, Plaintiffs' assert that at the time Flight KE 007 reported BETHEL, forty-nine minutes after takeoff,

**15.** At various check-in points KE 007 reported its position through KE 015, a flight that left shortly after KE 007 and was travelling the same assigned route. The Court has already held that this was not unusual and was no basis for the air traffic controllers to believe that there may have been a problem with KE 007. *In re Korean Air Lines Disaster of September 1, 1983,* 646 F.Supp. 30, 32 (D.D.C.1986). There may be a basis for distinguishing this finding as applied to KAL, however, because the fact that the relayed reports were not unusual from the air traffic controllers' standpoint does not necessarily mean that the failure to be able to communicate directly with the air traffic controllers did not alert the crew that it was off-course. For example, a few of the air traffic controllers' who noted that it was not unusual to receive relayed reports gave various reasons why such reports were not unusual, including common practice of certain airlines, the type of radio in the aircraft, and weather problems. *See* KAL's Exhibit K, Deposition of Anderson at

70–72; KAL's Exhibit J, Deposition Testimony of DeGarmo at 80. Given the myriad of innocent reasons for relayed reports, it is quite reasonable that such reports were of no concern to the air traffic controllers. The pilot, of course, can eliminate many of the innocent reasons.

Nevertheless, because the other clues to KE 007's off-track raises a factual issue of whether the crew knew the flight was off-course, the Court need not address whether the finding as to the air traffic controllers, that the relayed reports were not unusual, applies here.

**16.** Plaintiffs also assert that the crew's initial cross-check at Cairn Mountain would have revealed that they were off-course. The Court, however, has already held that the undisputed evidence established that the deviation from track at this stage was within normal limits, *In re Korean Air Lines Disaster of September 1, 1983,* 646 F.Supp. 30, 32 (D.D.C.1986), and Plaintiffs' have not submitted anything to place this finding in doubt.

the flight was twelve miles off track. All pilots operating INS equipment, according to Plaintiffs, were trained that an INS unit should not be relied upon if a cross-check shows a course deviation of more than two miles in one hour. Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 17. The twelve mile deviation, therefore, was six times the allowable deviation, and the crew therefore would have known that the INS unit was unreliable. Moreover, the crew would have observed similar "obvious aberrations" for the rest of the flight. Plaintiffs' Exhibit C, Affidavit of James C. Sampair at 13. With respect to waypoints NABIE and NEEVA, the crew would not have been able to receive the signals from the ground based aids because they were so far off-course, which would have alerted the crew to their substantial deviation. As cross-checking the system was mandated by sound piloting practice, Plaintiffs' contend, it can only be that the crew either knew that they were off-course or they intentionally failed to do the mandated cross-checks. As evidence that such cross-checks were required, Plaintiffs refer to their affiants' assertion that such cross-checks were required, Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 10; Plaintiffs' Exhibit C, Affidavit of James C. Sampair at 7–9; Plaintiffs also cite to International Rules of Air, § 3.6.2, *reprinted in* Plaintiffs' Exhibit V to Opposition; and also cite to deposition testimony of KAL pilots that such cross-checks were customary. Plaintiffs' Exhibit J, Deposition Testimony of Taek–Yong Choi at 272; Plaintiffs' Exhibit I, Deposition Testimony of Myong–Ok So at 23–26, 41–43. And, of course, to support their conclusion that such cross-checks would have alerted the crew that they were off-course, Plaintiffs rely on their most probable course scenario.[17] Once again, the Court finds that KAL's attempt to undermine this evidentiary support for Plaintiffs' conclusions is inadequate.

With respect to waypoint BETHEL, KAL does not dispute the mandatory nature of the cross-check. *Compare* Reply Affidavit of George N. Tompkins, Jr., at ¶ 6 (attempting to rebut Plaintiffs' conclusions as to BETHEL) *with id.* at ¶ 7 (attempting to rebut Plaintiffs' conclusions as to NABIE and NEEVA). Instead, KAL attacks Plaintiffs' assertion that KE 007 was 12 miles off-course when reporting at BETHEL. According to KAL, the only evidence that KE 007 was 12 miles off-track is the King Salmon radar, which has been characterized as "not usable," "not commissioned" and "uncertified" by the Federal Aviation Administration. *Id.* at ¶ 6 (quoting Robert F. Harik, Reply Exhibit C at 19–20, 44–45). KAL then goes on to state that this radar is often 5 to 8 miles off, *id.* (citing Judy A. Nickell, Reply Exhibit D at 45–46 and Douglas Leslie Porter, Reply Exhibit A at 378), and that if it was 8 miles off then KE 007's flight path would have been within normal range. Since it is KAL's burden to establish that Plaintiffs' evidence is legally insufficient, it would be improper to give KAL the benefit of the two assumptions it makes: one, that the King Salmon was inaccurate, and two, that it was inaccurate to the *maximum extent.* The degree of error could depend on various factors, and there is no basis to assume it was inaccurate by eight miles in this particular instance. Indeed an eight mile error would place KE 007 within four miles of BETHEL; this is inconsistent with the ICAO Report that found that the course deviation grew greater and greater from take-off. As the undisputed evidence places KE 007 6 miles off-track at Cairn Mountain, the evidence supports the conclusion that it was at least that much off-track at BETHEL. *See* KAL's Exhibit A, ICAO Report at 5, ¶ 1.1.8. Plaintiffs may be able to show that it was entirely accurate, by for example showing that it is consistent with other radar data that helped them develop their most probable course.[18] That the

---

17. The deviation found by the ICAO Report would also support the conclusion that the crew would have known that they were off-course had they conducted the cross-checks.

18. Indeed, the ICAO Report, although it noted that this radar was uncertified for F.A.A. use, concluded that its data was "sufficiently reliable" for tracking KE 007, because it was con-

FAA did not consider it reliable enough for civilian air traffic control does not make the radar data legally irrelevant.

Perhaps realizing that this line of attack could not carry the day, KAL asserts that even assuming a twelve mile deviation at BETHEL, there was no regulation or even general practice that it be reported. Reply Affidavit of George N. Tompkins at ¶ 6 (citing Jonghi Kim, Reply Exhibit F at 90–91). This assertion, however, is controverted by Plaintiffs, who assert that such a deviation indicates that the INS is unreliable. Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 17. In addition, it is somewhat inconsistent with their prior admission that four miles is the extent of permissible deviation. Tompkins' Reply Affidavit at ¶ 6; *see also* Reply Exhibit E, Deposition Testimony of Choi at 265 (permissible deviation four miles). Indeed even the KAL deponent who testified that there was no regulation or standard practice requiring such deviation to be reported stated he would report such a deviation. Reply Exhibit F, Deposition Testimony of Jonghi Kim at 91. Moreover, the issue is not whether a formal regulation—either KAL's or anyone else's—requires that it be reported, but whether safe piloting practice requires that it be reported. *See KLM v. Tuller*, 292 F.2d 775, 779 (D.D.C.1961). Finally, it sidesteps a crucial issue: such a deviation clearly required corrective action, which the evidence reveals was not taken.[19] Plaintiffs' do not assert that the crews' failure to report the twelve mile deviation constitutes willful misconduct; rather they assert that it was the failure to take the corrective action required by such deviation that evidences willful misconduct.

Therefore, the mandatory nature of the BETHEL cross-check, the magnitude of the course deviation at that time, and the probability that the deviation was noticed supports an inference that the crew knew at least as early as when it reached BETHEL that the INS was not operating properly. Assuming arguendo that this evidence only permits the inference that the crew negligently performed (or failed to perform) this particular cross-check, the flight's ever increasing deviation and the crew's failure to take corrective action over the following four and one-half hours evidences a knowing recognition of INS failure. A jury could refuse to believe that a five hour deviation was caused by continuous negligence (which the jury could alternatively characterize as reckless disregard of the consequences), and infer instead that KE 007's flight path was caused by a knowing attempt to fly with an unreliable INS; for the same reasons (to be discussed below) that the jury could refuse to believe that continuous negligence caused the deviation, it could infer that the crew had to know that the INS was unreliable.

With respect to the crew's alleged failure to cross-check at waypoints NABIE and NEEVA, KAL asserts that the evidence establishes that such cross-checks were not "required" by KAL regulations; it was merely "customary" to make such cross-checks. Reply Affidavit of George N. Tompkins at ¶ 7 (citing Deposition Testimony of Choi at 272–73, Reply Exhibit E and Deposition Testimony of Hwang at 37–39, Reply Exhibit G). This response is clearly inadequate. Whether KAL embodied the practice of cross-checks into formal regulations is not determinative for the Court or jury that such cross-checks were not mandated by safe piloting procedures.[20] *See*

sistent with the Kenai radar data. ICAO Report at 38, ¶ 2.10.4, Plaintiffs' Exhibit S.

**19.** It is unclear whether KAL's assertion that standard practice did not require such a deviation to be reported is intended to controvert Plaintiffs' assertion that such a deviation indicates that the INS was unreliable, or that even if it shows that the INS is unreliable the crew need not report the INS problem and/or temporarily abort the flight. In either case, Plaintiffs' affidavits raise a factual issue as to the proper response by the crew to a twelve mile deviation.

**20.** It is unclear whether the International Rules of the Air, § 3.6.2, *reprinted in* Plaintiffs' Exhibit V, "require" such cross-checks. Plaintiffs' memorandum in opposition makes this claim, Plaintiffs' Opposition to Korean Air Lines Motion for Partial Summary Judgment at 9, and the regulations could possibly be so interpreted. But the requirement does not appear to be explicit. KAL's failure to address whether the International Rules of Air "require" such cross-checks is probably sufficient grounds to conclude that, at the very least, testimony on whether the regu-

*KLM v. Tuller,* 292 F.2d 775, 779 (D.D.C. 1961) (Court not bound by limits of the Irish Government's regulations as to when life vest instructions should be given to fulfill the duty of care owed to passengers; jury could find that KLM's failure to establish and execute procedures to instruct passengers as to the location and use of life-vests was a conscious and wilful omission to perform a positive duty and constituted reckless disregard of the consequences, even though regulations did not require such instructions for that type of flight). Moreover, even by KAL's own admission such cross-checks were customary; certainly they were customary for a reason. And KAL's assertion that such cross-checks might not have alerted the crew that they were off-course is certainly sufficiently controverted by Plaintiffs. *See* Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 12–13 (could not remember one occasion when he could not receive navigational signals when abeam these checkpoints); Plaintiffs' Exhibit C, Affidavit of James C. Sampair at 9–10 (same). *Compare with* KAL's Reply Exhibit G, Deposition Testimony of Hwang at 39 ("sometimes the indication [from waypoint NABIE] is good and sometimes the indication is not good.") *and* Reply Exhibit E, Deposition Testimony of Choi at 273 (St Paul DME, the navaid used at NABIE, too far way to track).[21]

The dispute over the necessity and efficacy of cross-checking through use of the weather radar in the ground mapping mode runs along similar lines. Plaintiffs assert that use of such navigational aids was required by safe piloting practice, particularly at night.[22] Plaintiffs' Opposition to Motion for Partial Summary Judgment at 6; Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 13; Plaintiffs' Exhibit C, Affi-

davit of James C. Sampair at 8–11; *see also* Plaintiffs' Exhibit S, ICAO Report at 36, ¶ 2.6.[23] Similarly, Plaintiffs assert that use of this device would have alerted the crew that they were off-course, because it would have revealed land masses to be in different relative locations than they would have appeared if they were on course. Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 13–14; Plaintiffs' Exhibit C, Affidavit of James C. Sampair at 8–11; *see also* Plaintiffs' Exhibit S, ICAO Report at 36, ¶ 2.6.

Again, KAL asserts that use of the weather radar was not required, merely customary. Reply Affidavit of George N. Tompkins at ¶ 8 (citing Reply Exhibit E, Deposition Testimony of Choi at 280–82; Reply Exhibit H, Deposition Testimony of So at 12–13, 15–16; Reply Exhibit I, Deposition Testimony of Y.B. Kim at 74–75; Reply Exhibit F, Deposition Testimony of J. Kim at 90–91; Reply Exhibit G, Deposition Testimony of Hwang at 179–80). For the reasons discussed above with respect to the ground based navigational aids, this is no answer. Moreover, all KAL pilots testified, either explicitly or by clear implication, that use of the weather radar in the ground mapping mode was proper, good and expected piloting procedure whether or not it was contained in KAL regulations. *See* Plaintiffs' Exhibit J, Deposition Testimony of Choi at 280–81; Plaintiffs' Exhibit I, Deposition Testimony of So at 12–13; Plaintiffs' Exhibit K, Deposition Testimony of Sun at 179–80; Plaintiffs' Exhibit F, Deposition Testimony of Y.B. Kim at 74; KAL's Reply Exhibit F, Deposition Testimony of J. Kim at 91.

KAL asserts the cross-checks with the weather radar may not have alerted the crew that they were off-course. Reply Af-

lations required such cross-checks would be helpful. Moreover, even if the regulations did not in and of themselves require such cross-checks, Plaintiffs' assertion that such cross-checks were required by safe piloting practices raises a factual issue.

21. Significantly neither of these KAL deponents discuss whether the cross-check at NEEVA would have alerted the crew that they were off-course.

22. Flight KE 007 was a night flight

23. The ICAO Report states that use of weather radar in the ground mapping mode was required by some airlines for the assigned route and was common practice for KAL. Plaintiffs' Exhibit S, ICAO Report at 36, ¶ 2.6. It does not appear that this practice was embodied in a formal regulation, but that of course is not dispositive. *See Tuller,* 292 F.2d at 779.

fidavit of George N. Tompkins, at ¶ 8 (citing ICAO Report at ¶ 1.7.2.1., Reply Exhibit J; Deposition Testimony of So at 79–80, Reply Exhibit H; Deposition Testimony of Y.B. Kim at 75, 83–84, Reply Exhibit I). This assertion, however, only establishes a factual issue—whether the weather conditions prevented effective use of the weather radar.[24] It would be improper to resolve this issue on the record before the Court at this stage.

Several other general attacks by KAL are also insufficient. Again they assert that there is no evidence that the aircraft's radio navigation instruments and weather radar were functioning properly. This is clearly erroneous. The equipment was found to be working during and after the New York to Anchorage trip, and this is a sufficient basis for inferring that the equipment was working during the fatal leg of the flight. *See supra* note 14 and accompanying text.

KAL also asserts that there is no evidence of whether the crew attempted to use the ground based navigational aids or the weather radar to cross-check the INS. Tompkins' Reply Affidavit at ¶ 4. This is erroneous. As admitted by KAL, use of such procedures was "customary"; moreover, the captain and crew of KE 007 had recently received excellent ratings in use of INS and radio and navigational aids. KAL's Statement of Material Facts as to Which There Is No Genuine Issue at 5, ¶ 15; KAL's Exhibit A, ICAO Report at 7–9. This is a sufficient evidentiary basis for the jury to infer that the crew attempted to use such aids.[25] *Cf.* F.R.E. 406 (evidence of habit or routine practice relevant to prove that conduct was in conformity with habit or routine practice).

This brings the Court to yet another disturbing aspect of the flight record: The position reports. KAL asserts that because the F.A.A. controllers and all who reviewed the position reports considered these reports to be "normal" and "routine", this establishes that the crew was unaware of their course deviation.[26] But in light of the evidence of 1) the flights' substantial deviation and 2) the likelihood that they knew they were off-course, contrary inferences are permissible: 1) that the crew made false reports and 2) that the crew knew these reports were false. That the reports were false is supported by substantial evidence, even if Plaintiffs' most probable course is not found to be supported by substantial evidence. The ICAO Report concluded that the flight was off-course from the beginning and continued to go off-course to an increasing degree, KAL's

---

**24.** Any significant cloud cover would prevent effective use of the weather radar for the purpose of examining land masses. KAL's Reply Exhibit H, Deposition Testimony of So at 79–80; KAL's Reply Exhibit I, Deposition Testimony of Y.B. Kim at 83–84. KAL then refers to the ICAO Report, which states that there was "extensive coverage of low, medium and high level clouds over Southern Kamchatka", decreasing to scattered low clouds over the Sea of Okhotsk, and increasing again approaching southern Sakhalin (near the estimated wreckage site). *See* Reply Affidavit of George N. Tompkins at ¶ 8 (citing Exhibit J, ICAO Report at ¶ 1.7.2.1). This plainly leaves a factual issue. There were large land masses prior to Southern Kamchatka that, if noticed, would have alerted the crew. *See* ICAO Report at 36, ¶ 2.6.1. *See also* Plaintiffs' Exhibit B–1 (map of area depicting planned and most probable route); Plaintiffs' Exhibit B, Affidavit of Frank L. Houston at 13–14; Plaintiffs' Exhibit C, Affidavit of James C. Sampair at 8–11. Even after Kamchatka, the place where there was significant cloud cover, there were stretches of only scattered cloud cover, which may have provided an opportunity

to detect the course deviation. Moreover, the ICAO Report's description of the cloud cover places it significantly off-course of KE 007's assigned route, and the weather over the assigned route was good that night. *See* Plaintiffs' Exhibit K, Deposition Testimony of Sun at 179–80. If KE 007 could not use the weather radar because of the crowd cover in the places described in the ICAO Report, it arguably supports Plaintiffs' contention that the flight was beyond the range of the ground based aids. Thus, the crew would be flying without any navigational aids to cross-check the INS system that allegedly was providing obvious signals that it had been misprogrammed or misaligned.

**25.** Alternatively, if the jury disbelieved this evidence, the failure to use these customary aids could be found to constitute willful misconduct.

**26.** This characterization of the reports, however, are from the viewpoint of those receiving the reports, who had no means to cross-check their accuracy. "Normal" and "routine", therefore, are clearly not synonymous with "accurate."

Exhibit A, ICAO Report at 1, and that by the time the flight reached waypoints NABIE and NEEVA the airplane was beyond the range of the ground based navigational aids for those waypoints. *Id.* at 38. That the reports were deliberately false is supported by the evidence indicating that the crew had to have known that they were off-course. Indeed, it is not apparent, if either Plaintiffs' most probable course scenario *or* the ICAO conclusions are believed *or* the ANC Report is believed, on what basis the crew could have believed that they were on course when they reported reaching BETHEL, NABIE *and* NEEVA, particularly NABIE and NEEVA, when by several sources the crew was by then hundreds of miles off-course. They could not have relied on reports from the ground based navigational aids at these waypoints, because at BETHEL the information would have shown that they were off-course, and at NABIE and NEEVA they were not even close enough to receive information. Of course they could not have relied on information from the weather radar, because that also, to the extent it was usable to depict land masses, would have shown them to be far off-course. And of course, if extensive cloud cover precluded effective use of the weather radar,[27] it would not provide a basis for the reports. Similarly, if the INS system was fully operational, its readings would have shown that the flight was off-course at all three waypoints; to postulate that the entire crew misread the INS three times (as well as throughout the flight) to report being on course for all three waypoints is not consonant with the experience and skill of the captain and crew of KE 007, and certainly is a postulation which the jury could either not believe or could find constitutes willful misconduct. Conversely, a misprogrammed or misaligned INS system could have misled the crew into believing that they were on course—the one of two ways the ICAO Report concluded that the crew could have been misled into believing they were on course and have information to provide the reports [28]—but this supports Plaintiffs' primary theory that the INS had been misprogrammed. And it still leaves the question of the degree of inattentiveness that would have allowed the crew not to perceive the error in the INS system over a five-hour period. A jury could believe that the "obvious" indications that the INS system was either misprogrammed or misaligned had to have been noticed by the crew (or that the crew could only fail to have noticed the indications because of a reckless disregard of the consequences; again, the indications would have to have been missed continuously over a five-hour period). Therefore, the jury could permissibly infer that the crew knowingly gave false reports (or gave reports with a reckless disregard of whether they were true or not).

In sum, the following facts, which are either undisputed or are supported by suf-

---

**27.** According to the ICAO Report's description of where was the extensive cloud cover, contrasted with the map showing the most probable course, the extensive cloud cover did not start until well after waypoint NABIE and even after waypoint NEEVA.

**28.** The ICAO Report's simulation involving a ten percent programming error concludes that the read-outs could have misled the crew into believing they were on course and provided information on which to base their erroneous reports. *See* Plaintiffs' Exhibit S, ICAO Report at 52, ¶ 2.14.9.3. It also concludes that this simulation assumed "a considerable degree of lack of alertness and attentiveness on the part of the entire flight crew but not to a degree that was unknown in international civil aviation." *Id.* at 56, ¶ p. This final and somewhat ambiguous conclusion hardly precludes a finding of willful misconduct. The line between a "considerable degree of lack of alertness and attentiveness on the part of the entire crew" and reckless disregard of the consequences is surely one that the jury should draw. Likewise, that such a degree of inattentiveness was not "unknown in international civil aviation" is not dispositive: First, it is controverted by Plaintiffs; and second, willful misconduct also is not "unknown in international civil aviation."

The ICAO Report briefly stated another simulation that would have misled the crew as to whether they were on-course—the holding of a constant magnetic heading of 246 degrees. *Id.* at 47, ¶ 2.14.7. Neither party discussed how this could have occurred or whether this would or would not support a finding of willful misconduct. But the ICAO Report did conclude that such an error would have required a "considerable degree of lack of alertness and attentiveness on the part of the entire crew." *Id.* at 56, ¶ p.

ficient evidence to allow the jury to find that they existed, would allow the jury to find 1) that the INS system was misprogrammed or misaligned and 2) that the crew detected the misprogramming or misalignment during the flight but elected to continue: [29] the magnitude of KE 007's deviation, which has substantial evidentiary support; the undisputed primacy of the INS systems as the means for navigating the flight and its function of informing the crew as to its location and direction and adherence to the flight plan; the evidence that the INS systems did not contain an undetected malfunction; the undisputed level of skill and experience of the crew; the evidence that customary, if not required, means of cross-checking the INS systems to determine adherence to flight plan and present location and direction were operative; the evidence that such devices were used and would have alerted the crew that they were off-course; the consistency between a misprogrammed INS system and the course deviation formulated by Plaintiffs and the ICAO Report; the evidence that such an error would have been readily apparent shortly after take-off, if not noticed before take-off; the evidence that pilots who had made errors requiring the dumping of fuel had been disciplined,[30] which may have provided the motivation of the crew to attempt the flight with an inoperative INS rather than risk retribution; and the position reports indicating arrival at waypoints that were always far away, sometimes hundreds of miles away.

Assuming the INS error occurred and was noticed by the crew, it appears undisputed that the crew was duty bound to report the INS problem and return to Anchorage or seek permission to land elsewhere, rather than attempt to navigate the flight with a misprogrammed or misaligned INS system. Similarly, there does not appear to be any genuine dispute that this duty was imposed for safety reasons. Finally, there is no genuine dispute that the crew was aware of this obligation (or at least KAL does not argue that there is no evidence to support the conclusion that the crew was aware of this obligation). Therefore, the crew's conduct, in not seeking assistance and aborting the flight, would constitute a "deliberate purpose not to discharge some duty necessary to safety,[31]" *KLM v. Tuller,* 292 F.2d 775, 778 (D.C.Cir. 1961) (quoting *American Airlines, Inc. v. Ulen,* 186 F.2d 529, 533 (D.C.Cir.1949), which is one of the alternative formulations of willful misconduct.

The above analysis is probably sufficient to conclude that the crew could be found to have had the state of mind required for KAL to be found guilty of willful misconduct, without regard to whether the crew "knew" that they were flying over Soviet air space and that such a flight path constituted an unreasonable risk of danger. As noted above, the crew's conduct would constitute a "deliberate purpose not to discharge some duty necessary to safety." Therefore, the first two elements of willful misconduct would be established: (1) an intentional act or omission performed with the knowledge that it was wrongful (the decision to attempt to continue the flight with an unreliable INS system; or in the alternative, a reckless failure to monitor

---

**29.** In the alternative, the jury could find that if no such error in programming or alignment occurred, it was willful misconduct to fail to discover the off-course track through standard use of the INS and the available navigational aids.

**30.** *See* Plaintiffs' Supplemental Submission in Opposition to KAL's Motion for Partial Summary Judgment at 13–14 (citing deposition testimony of Park); Supplemental Reply Memorandum of KAL in Further Support of Motion for Partial Summary Judgment (citing testimony of Park at 101–05, 117–20) (some KAL pilots disciplined for fuel dumping incident, others were not).

**31.** Alternatively, assuming a fully accurate INS system, the same analysis applies: the crew was aware of its duty to monitor the INS system for adherence to the flight plan and to cross-check it with the ground based navigational aids and the weather radar; these duties were required to insure safe operation of the flight; and the evidence as to the flight path (either Plaintiffs' or ICAO's) allows for the inference that there was, at least, a reckless indifference as to whether they were performed or not.

and cross-check the system); and (2) an awareness of the probable dangers (the dangers sought to be avoided by aborting the flight and re-programming the INS; or in the alternative, the dangers sought to be avoided by monitoring and cross-checking the INS system)[32]. Therefore, only the third ·element—causation—remains. Nevertheless, since whether the crew knew it was flying over the Soviet Union and that posed an unreasonable risk of danger[33] is relevant to Plaintiffs' charge of willful misconduct, a discussion whether there is sufficient evidence to support a finding that such knowledge existed follows.

Essentially, the same evidence that would allow the jury to find that the crew knew they were off-course would allow it to find that the crew knew they were over the Soviet Union. As noted above, the weather radar, a customary if not required means of cross-checking the INS, would have revealed topography indicating that the flight was over the Soviet Union. As the crew was quite familiar with this route, the jury could therefore infer that the crew knew that it was flying over the Soviet Union. Similarly, given the proximity of the Soviet Union to the assigned route, if the jury believed that the crew did not cross-check the INS system and failed to notice the flight was off-course, it could find that the crew was recklessly indiffer-

ent to whether they were flying over the Soviet Union.

There is substantial evidence that the crew knew that flying over the Soviet Union was prohibited, and that it was "dangerous". *See* KAL's Reply Exhibit E, Deposition Testimony of Choi at 286–87 (KAL pilots knew by looking at chart and map that they were to avoid area, a non-free flying area); KAL's Reply Exhibit H, Deposition Testimony of So at 24–25 (knew that it was "dangerous" to enter non-free flying area without permission); KAL's Reply Exhibit G, Deposition Testimony of Hwang Duk Sun at 185–87 (aware of danger of entering Soviet air space by reading operations bulletin and route map).[34]

This brings the Court to the third element of Plaintiffs' cause of action—causation. KAL relies heavily on prior decisions of this Court holding that the Soviet attack was unforeseeable as a matter of law and a supervening cause with respect to any alleged negligence of the United States, Boeing Company and Litton Systems, Inc. *In re Korean Air Lines Disaster of September 1, 1983*, 646 F.Supp. 30, 35 (D.D.C. 1986); *In re Korean Air Lines Disaster of September 1, 1983*, slip op. at 19 (D.D.C. Aug. 2, 1985). Because those defendants stood in a fundamentally different position than does KAL, those decisions are of no avail to KAL.

**32.** Other than the danger of being shot down by Soviet interceptors, the parties have not discussed what other dangers are posed by trying to fly this particular route with a misprogrammed INS or without monitoring or cross-checking it. But it would seem apparent that either poses unreasonable risks, including the risk of crash because no one knows where the plane is in relation to other planes.

**33.** Actually, KAL appears to argue that the crew had to know that it was in danger of being shot down without warning. As will be discussed *infra*, the Court disagrees. At most, they only had to "know" that Soviet interception and forced landing was likely.

**34.** The jury would be free to discount the somewhat contradictory, and somewhat self-serving, later statements of these witnesses that they expected that the Soviet Union would follow ICAO interception procedures and not shoot down a civilian airliner. Similarly, the issue is

not whether these pilots believed that the Soviet Union would shoot down an intruding airliner without warning, but whether they believed that an intruding airliner faced an unreasonable risk of danger to the passengers. Assuming *arguendo* that an intentional, without-warning attack was not within the contemplation of KAL pilots, two issues would still remain: one, was the attack that destroyed KE 007 of that type?; and two, even if it was of that type, was it sufficiently similar to the specific danger KAL pilots feared so that it was within the scope of risk that KAL pilots actually foresaw. *See* note 38 *infra*.

Although this Court has held that the attack was intentional and caused the destruction of the airplane unnecessarily, *In re Korean Air Lines Disaster of September 1, 1983*, 646 F.Supp. 30, 35 (D.D.C.1986); *In re Korean Air Lines Disaster of September 1, 1983*, slip op. at 11 (D.D.C. Aug. 2, 1985), there was no discussion in either case of whether there were warnings given prior to the attack.

As an initial matter, it must be noted that "[p]roximate causation, including the question of superseding cause ... is ordinarily a question of fact for the jury." *Reiser v. District of Columbia*, 563 F.2d 462, 480 (D.C.Cir.1977), *vacated and reinstated in relevant part*, 580 F.2d 647 (D.C. Cir.1978) (*en banc*). When the court takes the issue of proximate causation from the jury, even though defendant's conduct is a cause in fact of plaintiff's injuries, it is, in essence, limiting the scope of a defendant's liability for his misconduct on policy grounds, primarily because liability for all injuries caused in fact by an actor's conduct is economically and socially undesirable. *See Klages v. General Ordinance Equipment Co.*, 240 Pa.Super. 356, 367 A.2d 304, 313 (1976), *quoted in In re Korean Air Lines Disaster of September 1, 1983*, slip op. at 18 (D.D.C. Aug. 2, 1985). But the degree of a defendant's culpability is a factor to be considered when making this determination. *See* Restatement of Law (Torts) 2d, § 501(2) (1965).[35] Therefore, "a jury may be permitted to find that a defendant's reckless misconduct bears a sufficient causal relation to a plaintiff's harm to make him liable, although were the defendant's conduct merely negligent, no such finding would be permissible." *Id.* comment a. *See generally* Bauer, *The Degree of Moral Fault as Affecting Defendant's Liability*, 81 U.Pa.L.Rev. 586 (1933).[36]

In addition to the higher degree of alleged misconduct against KAL compared to that of other defendants, there are other facts peculiar to KAL that warrant submission of the issue of proximate cause to the jury. First, there is KAL's involvement in the 1978 incident. In that incident, the Soviet Union intercepted and forced down a KAL plane that had flown over Soviet air space, causing severe damage to the plane and the deaths of passengers. Then, as it does now with respect to this incident, KAL contended that the Soviet Union shot the plane without warning. Plaintiffs' Exhibit P, KAL Aircraft Accident Report at 22.

KAL's prior experience with Soviet interception procedures is relevant to whether they actually foresaw a danger not foreseeable by other defendants. And from a pilot's point of view, a precipitously forced landing, which resulted in the deaths of passengers, is not so different in kind from what occurred on September 1, 1983 that the Court should resolve the issue on this record as a matter of law. In both cases the plane was shot upon, and lives were put at an intolerable risk. If KAL crews actually foresaw, based on prior experience[37], that the Soviet Union would violently and precipitously force down planes that intruded their air space, whether what occurred on September 1, 1983 was foreseeable to a KAL pilot is a question of fact for the jury.[38]

---

**35.** The text of this section reads:

The fact that the actor's misconduct is in reckless disregard of another's safety rather than merely negligent is a matter to be taken into account in determining whether a jury may reasonably find that the actor's conduct bears a sufficient causal relation to another's harm to make the actor liable therefor.

**36.** It is also perhaps worth noting that this concept of taking into account the defendant's moral culpability in determining the extent of his liability apparently derived from civil law practice of extending liability for *dolus* far beyond that allowed for *culpa* (negligence), *see* Bauer, *The Degree of Moral Fault as Affecting Defendant's Liability*, 81 U.Pa.L.Rev. 586 (1933); and the Warsaw Convention's willful misconduct standard was an attempt to find a common law equivalent to the civil law concept of *dol.*

If a defendant's conduct rises to the level of *dol,* it appears that civil law would render him liable for all injuries caused in fact. *See* Black's Law Dictionary 434 (5th ed. 1979) ("A person is always liable for *dolus* producing damage, but not always for *culpa* producing damage, even though extreme.")

**37.** There is evidence that the 1978 incident was part of the standard training given to KAL pilots. *See* Reply Exhibit G, Deposition Testimony of Hwang Duk Sun at 186–87.

**38.** Moreover, plaintiffs have recently pointed to evidence that suggests that this incident is more similar to the 1978 incident than originally believed: a copy of the Soviet Union report stating that the Soviet pilot fired tracer shots and made other warning maneuvers. Plaintiffs' asserted at oral argument that this report was admissible as a government records exception to the hearsay rule. KAL has not argued against this document's admissibility, and its inadmissibility is not apparent on its face.

Finally, the other defendants' alleged negligence were much further removed from the destruction than KAL's alleged willful misconduct. Even if the United States negligently failed to warn the crew early on that they were off-course, the crew's failure to perceive that they were off-course *and* to heed whatever warnings may have been given *and* the Soviet pilot's response broke the chain of causation. Similarly, assuming that a product defect in the INS system misled the crew into Soviet air space *and* that the crew was in no way negligent in failing to perceive that they were off-course, the crew's failure to heed the warnings *and* the Soviet pilot's response broke the chain of causation. Here, by contrast, it was solely KAL's alleged misconduct that put the plane in the vulnerable position and it was solely KAL's failure to perceive the warnings, if given, that made the Soviet pilot's response possible. KAL was in sole control of the airplane; only the crew had the ability to

prevent the flight from entering Soviet air space, and if it is found that warnings were given, only the crew had the ability to heed the warnings.

In sum, the alleged high degree of misconduct, KAL's prior experience with Soviet interception procedures, and the direct nexus between KAL's alleged misconduct and the Soviet interception creates an issue of fact as to the foreseeable risk created by KAL's alleged misconduct. A jury could find that the scope of risk created by KAL's alleged willful misconduct included negligent Soviet identification of the plane as a military plane and without warning attack, or if warnings were given, negligent failure to heed Soviet warnings.

Similarly, there is no basis for this Court to rule that the Soviet pilot's actions constituted a superceding cause. Again, this issue is usually left for the jury, *Reiser v. District of Columbia*, 563 F.2d 462, 480 (D.C.Cir.1977), and is also essentially a

Therefore, the court is justified in presuming its admissibility. Assuming the report's admissibility, KAL's attempt to distinguish the two incidents is less than compelling.

First, it should be noted that KAL was found guilty of willful misconduct with respect to the 1978 incident. KAL Reply Memorandum at 20 n. 6 (citing *Korean Air Lines v. Entiope, Bullentin des Arrets de la Cour de Cassation, Chambres Civiles 1981* (No. 385, Dec. 31, 1981); 36 Revue Francaise de Droit Aerien 215 (1982)). KAL distinguishes this by claiming that in the earlier decision (1) there was direct evidence of a deliberate failure to equip the aircraft with proper navigational equipment; (2) the Soviets followed ICAO interception procedures; (3) and the harm that occurred was within the scope of the foreseeable risk created, *i.e.*, that the aircraft would be forced to land if ICAO interception procedures used by Soviet fighters were ignored.

The deliberate (or reckless) conduct that allowed KE 007 to fly over Soviet air space, if proven, is analogous to "a deliberate failure to equip the aircraft with proper navigational equipment"; i.e., a deliberate (or reckless) failure to properly use equipment is equivalent to deliberate failure to install the equipment. In light of the Soviet Report, the similarity between the Soviet's use of ICAO interception procedures then and now merits closer attention. While a forced landing and a shooting over water may very well be qualitatively different, the fact remains that use of violence is prohibited by ICAO procedures (indeed, given the strong

presumption against the use of force, the French Court's finding that ICAO procedures were followed may reflect KAL's failure to heed the warnings rather than strict adherence by the Soviet Union to ICAO procedures). This court's declaration that the Soviet Union followed ICAO procedures in 1978 was based primarily on its determination that warnings were given; it clearly was not based on a careful scrutiny of exactly what occurred in 1978 with respect to adherence to ICAO procedures, because as is apparent that was largely irrelevant: Boeing, Litton and the United States could no more be liable for KAL's willful misconduct, if this incident was the same as the 1978 incident, than it could be for the Soviet's actions. Similarly, even if either or both the Soviet's and KAL's actions were found to be negligence (e.g., if KAL was innocently misled by defective products into Soviet air space but then negligently failed to perceive the warnings, and the Soviet pilot negligently mistook the KE 007 for a military plane), in whatever degree, those defendants could not be held liable for the combined negligence of KAL and the Soviet Union. And KAL's third distinguishing factor presumes the crucial issue: the scope of the foreseeable risk created. It is not known on what basis the French Court determined that ICAO interception procedures used by Soviet fighters were "ignored"; KAL asserted that the Soviet's shot them down without warning. If it was based on that crew's failure to notice the warnings, the similarity of the warnings would have to be determined, and then the scope of the risk created by ignoring the warnings.

question of foreseeability. By definition, superceding cause analysis is required only when the wrongdoer's misconduct could be found to be a substantial factor in bringing about plaintiff's injuries. Restatement (Second) of Torts § 440 (1977), *cited in In re Korean Air Lines Disaster of September 1, 1983*, slip op. at 15–16 (D.D.C. Aug. 2, 1985). As indicated above, KAL's conduct could be found to be a substantial factor of decedents' deaths. Therefore, the issue is whether they should be relieved of liability for their conduct.

Just as the determination to take the proximate cause issue from the jury is based on policy considerations properly made by the court, so is the determination to find a superceding cause as a matter of law; indeed, they both involve the same basic issue: how far should liability extend for defendant's misconduct; *i.e.*, what consequences fall within the scope of risks created by a wrongdoer's misconduct. For the same reasons described above—the differences in degree of alleged misconduct, KAL's prior experience with Soviet interception efforts, and the crew's conduct's direct nexus to the off-course path—the jury should be the body to determine whether the attack was within the scope of risks created by the crew's willful misconduct, if proven, even though it was not within the scope of risks created by the

United States', Boeing's and Litton's alleged negligence.[39]

## THE MOTION TO STRIKE JURY DEMAND

The factual predicate for this motion is that the deaths of the passengers aboard KAL flight KE 007 occurred on the high seas more than a marine league from the shore of any state, the District of Columbia or any territory of the United States. It follows, therefore, that the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 761 *et seq.*, applies. *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). As a cause of action under DOHSA is in admiralty, and jury trials are generally not available in admiralty, it follows, according to KAL, that Plaintiffs are not entitled to jury trials.

Plaintiffs do not, obviously, contest the factual predicate for the motion. Similarly, they do not contest the proposition that DOHSA suits are in admiralty. They point out, however, that not all complaints in the litigation allege DOHSA as the basis for recovery.[40] In all cases, Plaintiffs allege, the complaints alleged death and survival claims in suits at law and did not make a F.R.C.P. 9(h)[41] designation of their claims as admiralty claims. *See* Plaintiffs' Oppo-

---

**39.** Moreover, as the jury could find the Soviet's actions within the scope of risk created by the crew's action even if the attack was without warning, the possibility that warnings were given is an even more compelling reason for leaving the issue for trial. There is no reason in law to relieve KAL of liability if the crew was found to be guilty of willful misconduct in navigating the flight without a reliable INS or with a reckless disregard of the readings from the INS over five hours, followed by the crew's negligent (at least) failure to perceive the warnings.

**40.** Plaintiffs have grouped the various complaints into four categories:

1) complaints predicated on diversity jurisdiction jointly with federal question—Warsaw Treaty jurisdiction, but not DOHSA or admiralty jurisdiction;

2) complaints predicated on diversity jurisdiction exclusively and asserting state and foreign law, but not DOHSA;

3) complaints predicated on diversity, DOHSA and admiralty jurisdiction;

4) complaints predicated on diversity, Warsaw and DOHSA jurisdiction.

Plaintiffs' Steering Committee's Memorandum of Law in Opposition to the Motion of Korean Air Lines to Strike Plaintiffs' Jury Demands at 2–3.

**41.** Rule 9(h) provides, in relevant part:

A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules ... 38(e).... If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not.

F.R.C.P. 9(h). Rule 38(e) provides:

These rules shall not be construed to create a right to trial by jury of the issues in an admiralty or maritime claim within the meaning of Rule 9(h).

*Id.* at 38(e).

sition to Motion to Strike Jury Demand at 3.

KAL relies primarily on *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), and *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). These cases hold that DOHSA is the exclusive remedy for wrongful death for deaths occurring on the high seas. More specifically, *Higginbotham* held that a plaintiff suing under DOHSA could not recover for loss of society—even though a plaintiff suing under general federal maritime law for a death occurring in territorial waters could recover for loss of society [42]—because DOHSA specifically limited recovery to pecuniary loss. *Higginbotham*, 436 U.S. at 622–26, 98 S.Ct. at 2013–15. *Offshore Logistics* holds that in cases where DOHSA applies a plaintiff may not supplement the recovery provided by DOHSA by resort to state wrongful death statutes. *Offshore Logistics*, 477 U.S. at 232, 106 S.Ct. at 2500. In essence, these cases hold that DOHSA, when it applies, preempts inconsistent federal law (*Higginbotham*) and inconsistent state law (*Offshore Logistics*). Neither case, however, discussed the availability of jury trials in cases covered by DOHSA. Nevertheless KAL argues that these cases, when combined with the general rule that admiralty suits are tried without a jury, establish that Plaintiffs are not entitled to a jury trial notwithstanding the existence of any other cause of action that would otherwise support a jury demand. Because these cases do not have the preemptive force which they are asked to bear, the Court disagrees.[43]

Although Congress placed federal jurisdiction under DOHSA in admiralty, that is not enough to establish that it intended that jury trials would never be available for DOHSA claims. *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 400 n. 14, 90 S.Ct. 1772, 1787 n. 14, 26 L.Ed.2d 339 (1970) ("If we found from the legislative history that Congress imposed exclusive jurisdiction because of a desire to avoid the presentation of wrongful-death claims to juries, that might support an inference that Congress meant to forbid nonstatutory maritime actions for wrongful death.... However, that is not the case.")[44] Since DOHSA was enacted to provide a remedy where none existed, Congress did not consider the availability of jury trials when an additional federal remedy existed; however, it assumed that jury trials would be available when admiralty practice allowed for jury trials. 59 Cong.Rec. 4485 (1920) (remarks of Rep. Volstead). Therefore, it cannot be said that jury trials are repugnant to the DOHSA scheme, at least where there are concurrent claims triable by the jury joined with the DOHSA claim.

This is entirely consistent with the general rule that when claims carrying a right to

---

**42.** *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

**43.** In fact, carried to its logical conclusion, KAL's argument arguably supports the conclusion that DOHSA preempts the Warsaw Convention's limitation of liability. In *Higginbotham*, the Court held that the DOHSA standard of recovery preempted a more generous federal standard of recovery; and *Offshore Logistics* held that a plaintiff could not supplement a DOHSA recovery with a more generous state wrongful death recovery. In both cases, it was the fact that Congress had specifically addressed the issue of the standard of recovery available that was determinative, and which compelled the conclusion that the DOHSA standard of recovery was exclusive. Similarly, it can be argued that it preempts a less generous federal standard of recovery. Of course the international character of the Warsaw Convention is more than sufficient to distinguish this case from *Higginbotham*, and the Court does not suggest that DOHSA can be used to vitiate the Warsaw Convention's limitation of liability. Indeed, an explicit Treaty provision would indicate otherwise. *See Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1104 n. 15 (D.C.Cir.1988) ("[A]n action for damages sustained in international air transportation, 'however founded, can only be brought subject to the conditions and limits set out in this convention.'") (quoting Article 24(1) of Warsaw Convention). The argument is only offered to show that KAL's argument proves too much.

**44.** *See also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 360, 82 S.Ct. 780, 784, 7 L.Ed.2d 798 (1962) (suits *in personam* may be brought in admiralty or in civil courts); 59 Cong.Rec. 4485 (1920) (remarks of Rep. Volstead) (DOHSA does not preclude use of jury trials in all cases).

jury trial are joined with admiralty claims and arise out of the same transaction or occurrence, all claims may be tried to a jury. *See Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963); *Red Star Towing & Transportation Co. v. "Ming Giant"*, 552 F.Supp. 367, 371 (S.D.N.Y.1982); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2315 (1971). In effect, KAL seeks to avoid this general rule that conflicts between admiralty's no jury command and the right to jury trial of other claims must be resolved in favor of allowing a jury trial by arguing that there is no conflict; *i.e.*, KAL's argument is that, in this instance, the Warsaw Convention claim is not triable by a jury.

KAL does not dispute that the Warsaw Convention creates, by its own force, a cause of action for wrongful death. Nor does it dispute that but for the location of the accident, a wrongful death claim under the Warsaw Convention is triable by a jury. KAL notes, however, that the Convention provides that "[q]uestions of procedure shall be governed by the law of the court to which the case is submitted," Motion to Strike Jury Demands at 10 (quoting Article 28(2) of the Warsaw Convention, 49 Stat. 3020), and goes on to argue that the question of procedure must be determined by DOHSA.

The problem with KAL's argument is that the "law of th[is] court" is not limited to DOHSA, notwithstanding the "exclusive" nature of the DOHSA remedy. Although DOHSA's exclusivity means that its scheme will ordinarily prevail in cases of conflict, it does not mean that courts can ignore other laws. There is no justification for looking solely to DOHSA to answer the jury trial issue for two reasons: First, Plaintiffs would have a wrongful death cause of action under the Warsaw Convention and this court would have jurisdiction to adjudicate that claim without DOHSA. A general rule regarding the availability of jury trials in Warsaw Convention wrongful death claims is desirable; if necessary, exceptions can be made on the basis of explicit statutory commands. Second, DOHSA does not provide an explicit answer, even in cases where there are no other claims, *see Peace v. Fidalgo Island Packing Co.*, 419 F.2d 371, 372 (9th Cir.1969) (no language in DOHSA prohibits jury trial); *Red Star Towing & Transportation Co. v. "Ming Giant"*, 552 F.Supp. 367, 374–75 (S.D.N.Y. 1982); *cf. Fitzgerald v. United States Air Lines*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed. 2d 720 (1963) (nothing in Constitution, any statute or any rule of procedure forbids jury trials in maritime cases), but especially where there are concurrent claims. Therefore the better approach, fully consistent with the Warsaw Convention's approach of leaving procedural issues for determination by the forum court, is to ascertain whether the law of this court provides for a jury trial in wrongful death actions brought under the Warsaw Convention.

There can be little doubt that the law of the forum provides that, upon proper demand, a wrongful death action under the Warsaw Convention normally must be tried by a jury. The specific procedural question at issue here—the right to trial by jury—is determined by reference to federal law providing for jury trials of actions akin to those tried before a jury at common-law. *See Curtis v. Loether*, 415 U.S. 189, 193–96, 94 S.Ct. 1005, 1007–09, 39 L.Ed.2d 260 (1974). Wrongful death actions, essentially grounded in negligence and other common-law tort concepts, have been typically tried by juries. The nature of the issues to be tried—culpability, causation, and damages—are issues commonly reserved for juries. In sum, a wrongful death action under the Warsaw Convention should be tried by a jury.

The case KAL primarily relies upon to support its argument that the jury trial issue must be determined by reference to DOHSA is clearly inapposite. Moreover to the extent it is apposite, it supports the above analysis—that the issue must be determined by reference to general federal law.

In *Harris v. Polskie Linie Lotnicze*, 641 F.Supp. 94 (N.D.Cal.1986), *aff'd*, 820 F.2d 1000 (9th Cir.1987), the issue was whether Polish law or California law provided the measure of recovery in a wrongful death

claim brought under the Warsaw Convention by representatives of a California decedent killed in a crash in Poland. *Harris*, 641 F.Supp. at 95. The defendant in that action was an "agency or instrumentality" of Poland, and thus qualified as a "foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"). *Id.* Therefore, the district court's jurisdiction rested exclusively on FSIA. *Id., aff'd,* 820 F.2d at 1002. Under these circumstances, the district court looked to FSIA and found in it a choice of law provision mandating application of Polish law, the place of the accident. 641 F.Supp. at 97–98. The Court of Appeals, however, did not read FSIA as containing a choice of law provision; instead, "[i]n the absence of specific statutory guidance," 820 F.2d at 1003, the court used federal common law to ascertain the proper choice-of-law rule, which when applied also resulted in the application of Polish law. *Id.* at 1003–04.

There are several distinguishing factors, the most important of which is that *Harris* involves the rare situation where the Warsaw Convention did not provide the court with an independent basis for jurisdiction;[45] the plaintiff could not rely on the Warsaw Convention and federal question jurisdiction to recover against the defendant; FSIA provided the exclusive source of jurisdiction. Moreover, the Court of Appeals' approach is consistent with the above analysis. Just as FSIA did not specifically provide for choice-of-law, DOHSA does not specifically address the issue of jury trials. "In the absence of specific statutory guidance," the court should resolve the issue by resort to the federal common law, which clearly points in the direction of allowing a jury trial.

Finally, as noted above, DOHSA's scheme was not intended to preclude jury trials in cases involving DOHSA and other causes of actions; it allows for jury trials when jury claims are presented with DOH-

SA claims. *See Peace v. Fidalgo Island Packing Co.*, 419 F.2d 371 (9th Cir.1969) (DOHSA claim and Jones Act claim may be tried together by jury); *Red Star Towing & Transportation Co. v. "Ming Giant"*, 552 F.Supp. 367, 374–75 (S.D.N.Y.1982) (DOHSA claim against one defendant and Jones Act claim against another may be tried together by jury); *cf. Fitzgerald v. United States Lines*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963) (maintenance and cure maritime claim tried with Jones Act claim must be tried by jury); *Atlantic & Gulf Stevedores v. Ellerman Lines*, 369 U.S. 355, 359–60, 82 S.Ct. 780, 783, 7 L.Ed. 2d 798 (breach of maritime contract action may be tried in civil action; plaintiff entitled to jury). *See generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2315 (1971); 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3672 (1976). Thus to the extent there is a conflict between DOHSA's no jury command and the availability of a jury trial under the Warsaw Convention, the conflict must be resolved in favor of allowing a jury trial.

It is arguable that the interests of consistency and fairness dictate that the foregoing apply to all complaints, including those that did not allege Warsaw Treaty— federal question jurisdiction. This Court has already held the Warsaw Treaty applies to all complaints. Since plaintiffs will be bound by the Treaty's limitation of liability and willful misconduct standard regardless of whether they pled the Treaty to support their complaints, they should have the benefit of the Treaty as the source supporting their jury demand. It would be unjust to deny the jury demand on the basis that the Warsaw Treaty was not pled, deny or allow the trial court to deny leave to amend the complaint to plead the Warsaw Treaty, and then require the trial court to apply the Warsaw Treaty to the complaint. Similarly, assuming Plaintiffs must

---

**45.** Perhaps equally important is the different issues involved. No one has a "right" to application of a particular choice of law methodology. To the extent a person has a right to application of a particular law, that right is incorporated into the choice of law methodology and must be balanced against, among other things, the other party's right to application of the competing law. A person's right to a jury trial has constitutional implications; and no one has a right to a nonjury trial, so there is no balancing of rights involved.

have the right to amend their complaints to assert a Warsaw Treaty cause of action, if necessary, it would be wasteful to deny the jury demand on the basis that the Warsaw Treaty was not pled, and then allow plaintiffs to amend their complaints to plead a Warsaw Treaty cause of action, which would entitle plaintiffs to a jury trial. Nonetheless, in the interest of conceptual precision, the court will determine the jury demand issue by a strict reading of the complaints.

Two categories of complaints did not allege Warsaw Treaty jurisdiction. One alleged diversity jurisdiction and asserted state and federal law claims, but not DOHSA or admiralty. A second alleged diversity, DOHSA and admiralty jurisdiction. The first category can be further classified into those that alleged state survival claims, those that alleged state death claims, and those that alleged other federal claims.

For those that asserted diversity jurisdiction and alleged state survival claims, a jury trial is available. In *Offshore Logistics v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), the Court specifically noted that its decision left open whether state survival statutes could supplement DOHSA. 477 U.S. at 215 n. 1, 106 S.Ct. at 2491 n. 1. Thus, for the sole purpose of determining whether a jury trial is available, the Court holds that state survival statutes survive DOHSA's preemptive force; therefore, similar to the Warsaw Convention claims, there is a jury claim joined with a DOHSA claim, and both should be tried together before a jury.

Even if the state survival statutes are preempted by general maritime law (but not DOHSA), *see Evich v. Morris*, 819 F.2d 256, 258 (9th Cir.) (state law preempted by general maritime survival actions), *cert. denied*, —— U.S. ——, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987), this would not defeat Plaintiffs' jury demands. A plaintiff bringing a general maritime survival action in a case alleging and establishing diversity jurisdiction is entitled to a jury trial. *Favaloro v. S/S Golden Gate*, 687 F.Supp. 475,

481 (N.D.Cal.1987). Diversity plaintiffs have the option of suing on a maritime claim at law or in admiralty, at their option. *See Atlantic & Gulf Stevedores v. Ellerman Lines*, 369 U.S. 355, 359–60, 82 S.Ct. 780, 783, 7 L.Ed.2d 798 (1962); F.R.C.P. 9(h) advisory committee's note on 1966 amendment ("For example, a longshoreman's claim for personal injuries suffered by reason of the unseaworthiness of a vessel may be asserted in a suit in admiralty or, if diversity of citizenship exists, in a civil action."). *See generally Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) (discussing the historical allocation of admiralty jurisdiction among admiralty courts, state courts, and federal courts sitting in diversity).

Indeed, the purpose of Rule 9(h) is to provide a mechanism whereby the court can determine whether a plaintiff asserting an admiralty or maritime claim but also alleging diversity jurisdiction is seeking to take advantage of admiralty procedures and remedies or instead is seeking to pursue his claim at law. *Romero v. Bethlehem Steel Corp.*, 515 F.2d 1249, 1252 (5th Cir.1975); F.R.C.P. 9(h) advisory committee's note on 1966 amendment. Plaintiffs, of course, have elected not to take advantage of the "special benefits of admiralty procedures and remedies," *Romero*, 515 F.2d at 1252, by making the 9(h) designation, but instead have elected to proceed at law, with the concomitant right to a jury trial.

■ For those complaints that alleged state death claims, these death claims are apparently foreclosed by *Offshore Logistics*. Thus the allegation of diversity does little to support a jury trial; there is no claim (except the DOHSA claim which was not even pleaded), for the jury to try, unless the Court finds that a jury trial is available for the DOHSA claim. For the reasons discussed below, the Court holds that DOHSA claims brought by diversity plaintiffs for aviation torts may be tried by a jury.[46]

---

**46.** In light of this holding, which will be explained below, there is no need to discuss in

For those complaints that alleged diversity jurisdiction and either state death actions or federal law that does not contain a right of action, leaving in substance only diversity and DOHSA, the jury demand must still be honored, notwithstanding the general rule that DOHSA claims are tried without a jury. First, the principle and language of the cases holding that a diversity plaintiff asserting an *in personam* general maritime claim is entitled to a jury trial do not suggest much less compel that it cannot be applied to a DOHSA claim.[47] *See Atlantic & Gulf Stevedores v. Ellerman Lines*, 369 U.S. 355, 360, 82 S.Ct. 780, 784, 7 L.Ed.2d 798 (1962). Once the court has jurisdiction over the action by way of diversity, the jury demand issue should be determined by the nature of the issues to be tried. If a maritime claimant suing on general maritime law is entitled to present to the jury concepts that are peculiar to admiralty—*e.g.*, maintenance and cure, *Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963); and seaworthiness, *Atlantic & Gulf Stevedores v. Ellerman Lines*, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); *Johnson v. Venezuelan Line Steamship Co.*, 314 F.Supp. 1403 (E.D.La.1970)—because the action is *in personam* and diversity exists, *a fortiori* a diversity plaintiff seeking money damages should be entitled to have a jury consider concepts traditionally considered by juries, such as willful misconduct.

Assuming the general rule that diversity maritime plaintiffs asserting *in personam* claims are entitled to jury trials does not apply to DOHSA claims, because Congress specifically placed such claims in admiralty, *see Friedman v. Mitsubishi Aircraft International, Inc.*, 678 F.Supp. 1064 (S.D.N.Y.1988) (existence of diversity does not support jury demand for DOHSA claim where no other claims present), the Court would still honor the jury demand. As noted above, Congress' decision to place DOHSA claims in admiralty does not establish that it intended to preclude entirely the submission of DOHSA-based claims to juries. *Moragne v. States Marine Lines*, 398 U.S. 375, 400 n. 14, 90 S.Ct. 1772, 1787 n. 14, 26 L.Ed.2d 339 (1970). Assuming that Congress intended that the ordinary DOHSA claim involving a collision of vessels on the high seas would be tried without a jury, because the law of the seas would determine fault and liability, and further assuming that this general rule would not be affected by the existence of diversity jurisdiction, there is still compelling reason for honoring the jury demand. As the Supreme Court has stated in another context:

> Rules and concepts such as [seaworthiness, the nature of maintenance and cure, maritime liens, limitation of liability, etc] are wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from the navigational rules of the maritime road. The matters with which admiralty is basically concerned have no conceivable bearing on the operation of aircraft, whether over land or water.... [T]he plane's unexpected descent will almost invariably have been attributable to a cause unrelated to the sea—be it pilot error, defective design or manufacture of airframe or engine, error of a traffic controller at an airport, or some other cause;

detail the other categories of complaints. A few general observations are in order, however. For those complaints that alleged diversity and federal law other than Warsaw Treaty or general maritime law, these plaintiffs are in the same position as those who alleged state death claims, because none of the federal statutes referred to contain a cause of action. *See, e.g., Anderson v. USAir, Inc.*, 818 F.2d 49 (D.C.Cir.1987) (Federal Aviation Act does not contain implied right of action). Thus only the DOHSA claim remains to be tried. For those complaints that alleged diversity, DOHSA, and admiralty jurisdiction appear to be in the same position as those whose state survival claims are preempted by general maritime law—a diversity plaintiff bringing an *in personam* general maritime survival claim is entitled to a jury trial—because the only complaint submitted as representative of that category makes a general maritime survival claim.

**47.** *But see Friedman v. Mitsubishi Aircraft International, Inc.*, 678 F.Supp. 1064 (S.D.N.Y.1988) (existence of diversity does not support jury demand on DOHSA claim where no other claims are present).

and the determination of liability will thus be based on factual and conceptual inquiries unfamiliar to the law of admiralty.

*Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 270, 93 S.Ct. 493, 505, 34 L.Ed.2d 454 (1972).[48] The issues to be tried here, while involving factual and conceptual inquiries unfamiliar to the law of admiralty, are consistently submitted for consideration by juries.

In *Moragne,* the Court noted that the "erroneous" view that jurisdiction over DOHSA claims was exclusively in federal admiralty courts ignored the savings to suitors clause of 28 U.S.C. § 1333. *Moragne v. States Marine Lines,* 398 U.S. at 400 n. 14, 90 S.Ct. at 1787 n. 14. Thus the Court recognized that the common-law was competent to give a remedy for wrongful death.[49] Common law remedies are awarded by juries. In *Offshore Logistics,* the Court, although it held that DOHSA preempted state law where its provisions were explicit, said little about implicit procedural provisions. What it did say supports the Court's view. It recognized that state courts had jurisdiction over DOHSA claims, and that such concurrent jurisdiction was entirely appropriate: "Because the resolution of DOHSA claims does not normally require the expertise that admiralty courts bring to bear, DOHSA actions are clearly within the competence of state

courts to adjudicate." *Offshore Logistics,* 477 U.S. 207, 232, 106 S.Ct. 2485, 2500, 91 L.Ed.2d 174 (1986). Surely the Court did not intend to suggest that state courts could only exercise jurisdiction if they did not use juries; presumably, even assuming the Court could constitutionally direct otherwise, the Court left state courts free to use their own procedures, including jury trials. There is no reason why a diversity plaintiff in federal court should be treated any different, particularly in aviation cases where admiralty concepts are "wholly alien." *Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 270, 93 S.Ct. 493, 505, 34 L.Ed.2d 454. Finally, the Court has recognized that other admiralty procedures have been denied to aircraft carriers involved in tort cases brought in admiralty courts. *Id.* at 262, 93 S.Ct. at 501 (noting that aircraft owners could not invoke the benefits of the maritime doctrine of limitation of liability, citing *Dollins v. Pan-American Grace Airways, Inc.,* 27 F.Supp. 487, 488–89 (S.D.N.Y.1939); *Noakes v. Imperial Airways, Ltd,* 29 F.Supp. 412–13 (S.D.N.Y.1939)).[50] This provides a basis for denying the admiralty procedure of nonjury trials to aircraft carriers even if it must be available to sea vessels.

In sum, in the absence of clear congressional directions to the contrary, the Court holds that diversity plaintiffs in aviation

**48.** In this case the Court held that there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States, in the absence of an applicable statute such as DOHSA.

**49.** At the time DOHSA was enacted, the savings clause saved to suitors in admiralty "the right of a common law remedy where the common law is competent to give it." By the time *Moragne* was decided, the phraseology had changed to "any other remedy to which he is otherwise entitled." This substitution was considered "simpler and more expressive of the original intent of Congress and is in conformity with Rule 2 of the Federal Rules of Civil Procedure abolishing the distinction between law and equity." 28 U.S.C. § 1333 Revision Notes of 1948 Act.

**50.** Both cases based their decisions on their construction of the term "vessel" used in a statute codifying this maritime doctrine. *Dollins*

did not note the jurisdictional basis; *Noakes* was in admiralty.

It is notable that the Court twice noted that Congress consistently recognized the distinction between admiralty and aviation, whenever it specifically addressed the issue. *Executive Jet Aviation,* 409 U.S. at 262, 270, 93 S.Ct. at 501, 505. Although the second reference was qualified by the phrase "in contexts other than tort," this qualification appears to refer to DOHSA, whose applicability to aviation was a judicial development, and other judicial assumptions of admiralty jurisdiction over aviation tort cases. As far as the legislative history of DOHSA is concerned, it is apparent that Congress was concerned with insuring that a federal remedy for disasters on the seas was available; there is no indication that Congress specifically directed its attention to aviation disasters in general and jury trials in such cases in particular.

tort cases are entitled to submit their DOH-SA claims to the jury.

CONCLUSION

KAL has failed to carry its burden of persuading the court that there are no disputed material issues of fact and that it is entitled to judgment as a matter of law. The denial of KAL's Motion for Partial Summary Judgment should not be read as acceptance of Plaintiffs' theory; it is only recognition that KAL has failed to establish that the theory has an insufficient evidentiary basis so as to preclude its submission to the trier of fact. Admittedly, Plaintiffs' case is built primarily on indirect evidence which will require the fact-finder to draw a series of inferences; the jury may refuse to do so. But cases turning on a person's state of mind will always depend on the drawing of inferences, and the line between permissible inferences and the impermissible building of inferences is ephemeral at best.

Similarly, the foregoing analysis is not intended to imply that the difficulty in reconstructing the cause of the deviation from course will justify a shifting in the burden of proof in this case. Undeniably, Plaintiffs will have to prove that the deviation and resulting destruction of the aircraft were caused by KAL's willful misconduct; and KAL will have no "burden" of proving, or even suggesting, any innocent explanation for the accident. All that is determined here is that inferences suggested by Plaintiffs have a foundation in the evidence and are not unreasonable as a matter of law. Therefore, based on this record, a reasonable jury could find that it is more probable than not that the crew's willful misconduct caused decedents' deaths. The motion for partial summary judgment will therefore be denied.

Plaintiffs made proper and timely jury demands. DOHSA does not deny Plaintiffs their right to jury trials, because additional claims and alternative bases for jurisdiction exist, Plaintiffs did not make 9(h) designations, and the complaints seek only *in personam* relief. In the alternative, the Court holds that DOHSA does not preclude a jury trial to aviation tort victims who can also establish diversity jurisdiction. The Motion to Strike Jury Demands therefore will be denied.