**In re KOREAN AIR LINES DISASTER OF SEPTEMBER 1, 1983.**

**MDL No. 565.**

**Misc. No. 83–0345.**

United States District Court, District of Columbia.

May 7, 1986.

Juanita M. Madole, Liaison Counsel, Speiser, Krause & Madole, Washington, D.C., for plaintiff.

George N. Tompkins, Jr., Condon & Forsyth, Washington, D.C., for defendant Korean Air Lines.

Mark A. Dombroff, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendant U.S.

John J. Martin, Bigham, Englar, Jones & Houston, New York City, for defendant Litton Industries, Inc.

Mary Rose Hughes, Perkins, Coie, Stone, Olsen & Williams, Washington, D.C., for defendant The Boeing Co.

Embassy of U.S.S.R., Washington, D.C., for defendant Soviet Socialist Republic.

## MEMORANDUM

AUBREY E. ROBINSON, Jr., Chief Judge.

On September 1, 1983, 269 passengers including plaintiffs' decedents tragically died while en route from New York to Seoul, South Korea when Soviet military aircraft shot down Korean Air Lines Flight 007 over the Sea of Japan. Plaintiffs filed these suits for damages against several defendants including the United States government for allegedly breaching a duty it owed to the passengers. The Judicial Panel on Multidistrict Litigation transferred the cases, which had been filed in judicial districts across the country, to this Court.

Before the Court is the Motion by the United States for Summary Judgment. This is not the first time the government has so moved. On April 18, 1984, this Court denied the same motion on procedural grounds holding that "[a]t present, ... and giving the plaintiffs 'the benefit of inferences favorable to [their] cause, the record in its nebulous state simply does not establish the absence of a triable issue of fact.'" *In re Korean Air Lines Disaster of September 1, 1983*, 597 F.Supp. 613, 618 (D.D.C.1984) (quoting *Founding Church of Scientology v. National Security Agency*, 610 F.2d 824, 836 (D.C.Cir.1979)). Both parties have taken a great deal of discovery since April, 1984 culminating in the presentation of oral argument on November 8, 1985. After extensive consideration of the entire record in its present state, the Court holds that there exist no triable issues of material fact that could support Plaintiffs' claims against the United States. The government's motion for summary judgment under Rule 56(f) shall therefore be granted.

Although the cases at hand may be more historically significant than most tort claims, the legal analysis must follow the same pattern used in every negligence case; that is to say that the United States can be held liable for damages only if plaintiffs can prove that the government had "a legal duty to warn or advise civilian aircraft in the position of KAL 007 on August 31, 1983 and September 1, 1983," and that it breached this duty. *Id.* at 618–619. For plaintiffs to prevail there must also have been no superceding cause of harm. As outlined below, the Court finds that the United States Government did not breach any duty to Plaintiffs' decedents in its handling of this incident. Furthermore, even if it had breached such a duty, the action of the Soviets in shooting down a civilian aircraft was a superceding cause of harm insulating the United States from liability.

## I. *Alleged Sources of Duty to Warn*

■ Plaintiffs have diligently explored every avenue from which an actionable duty could arise on the part of the United States to warn civilian aircraft in the position of KAL 007. With the exception of a duty on the part of air traffic controllers to provide certain services in the Alaskan Flight Information Region which plaintiffs have failed to establish the controllers breached, Plaintiffs have found no such duty either imposed by law or voluntarily undertaken by the government. Each of their contentions will be explored below.

### A. *Air Traffic Controllers*

Plaintiffs correctly assert, and the government does not deny that "the United States can be held liable for the failure of air traffic controllers to provide their services with due care." Plaintiffs' Steering Committee's Opposition to the Govern-

ment's Motion for Summary Judgment at 11 (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)). Four controllers had contact with KAL 007 on the night in question. Although Plaintiffs have deposed all of them, they have failed to present evidence that any one performed his or her job negligently.

KAL 007 left Anchorage International Airport from runway 32 after receiving the air traffic control clearance to fly "direct Bethel when able." It is undisputed that this clearance allows the pilot discretion to proceed from where he is cleared to take a reasonable course towards Bethel. Deposition of Robert Hale, manager of the Accident/Incident Analysis Branch of the Air Traffic Service at 35–37. Although Plaintiffs make much of the undisputed fact that KAL 007 was flying north of Cairn Mountain about the time the first controller, Douglas Porter, terminated radar service to it,[1] the record is complete with undisputed testimony and documentary evidence that this flight path was normal. Plaintiffs have failed to present evidence to refute the statements of Mr. Hale and Mr. Porter or the evidence of comparable tracks which indicate that aircraft departing Anchorage from runway 32 customarily fly north of Cairn Mountain.

With regard to Mr. Porter, Plaintiffs also claim that he breached a duty to record the "observed position" of the aircraft on the plane's flight data strip. In light of the undisputed evidence that the flight path during the period of radar coverage was normal, nothing that the controller might have recorded would have altered the fate of the plane. It is simply illogical to con-

clude that the controller's actions while KAL 007 was under radar coverage led to the deaths of the passengers.

As for the other three controllers, Plaintiffs have presented no credible evidence that any of them breached a duty to Plaintiffs or their decedents. These controllers' sole contact with KAL 007 was through voice reports of the pilot. Nothing was unusual about these reports so they could not have alerted the controllers that the aircraft was off-course. Plaintiffs' allegations involving uncertified radar scopes[2] and unevidenced telephone calls[3] are not supported in the record and do not present issues of material fact that can defeat the government's motion.

### B. Search and Rescue Plan and Manual

#### 1. Background

The Search and Rescue Plan (SAR) was promulgated in 1956 by the President's Air Coordinating Committee, a committee comprised of the Secretaries of the Treasury, Defense and Commerce Departments, and the Chairmen of the Federal Communications Commission and Civil Aeronautics Board. The Plan was created "[t]o provide an over-all Search and Rescue Plan for effective utilization of all available facilities to include provisions for the control and coordination of all types of Search and Rescue." *United States v. Gavagan*, 280 F.2d 319, 322 (5th Cir.1960) (quoting The Civil Air Policy, May 1954, Recommendation No. 2, p. 44). The Court in *Gavagan* described the workings of the Plan:

It established three SAR Regions: (1) inland, (2) maritime, (3) overseas. The Air Force was designated as Regional

---

**1.** Only during the first 22 minutes and 47 seconds after leaving Anchorage was KAL 007 under radar coverage. At that point, the plane was 165 miles from Anchorage. Porter deposition at 201.

**2.** Plaintiffs have made unsubstantiated allegations concerning the availability of a military radar site at King Salmon, Alaska. The evidence is clear that this radar was uncertified for air traffic use due to position errors and that even if it were available to the air traffic con-

trollers on August 31, September 1, 1983, they were instructed not to use it.

**3.** Plaintiffs have alleged the possibility that the Air Force telephoned one of the air traffic controllers to alert him that KAL 007 was in peril. No evidence supports this position. *All* telephone conversations made to or from a controller position are recorded and the tapes have been available to Plaintiffs. No such conversation exists.

SAR Coordinator for (1) inland region and the Coast Guard for the (2) maritime region.

The Plan called for the making of interservice agreements by the Regional SAR Coordinator ... with the Armed Forces and government agencies. The purpose of such agreements was 'to organize existing agencies and their facilities ... in a basic network for rendering assistance both to military and non-military persons and property in distress ...' and to 'provide for the fullest practicable utilization of the facilities of such agencies in regional SAR missions under the Regional SAR Coordinator....'

*Id.* The original Plan stated as its objective

[t]o establish a National Search and Rescue Plan which will integrate into a cooperative network available U.S. SAR facilities which will be coordinated in any one area by a single federal agency in order to afford greater protection of life and property of citizens of the United States and insure greater efficiency and economy....

*Id.*

At the time of the tragedy involving KAL 007, the National Search and Rescue Plan of 1981 was in effect which "continue[d] by interagency agreement" the previous Plan. National SAR Plan of 1981 at A3. Also in effect was the SAR Manual, promulgated under the coordination of the U.S. Coast Guard. The SAR Manual "provides common procedures, techniques and terminology so that any military and civilian combination of forces can effectively accomplish search and rescue missions." SAR Manual at iii.

### 2. *Alleged Undertaking*

Plaintiffs allege that the SAR Plan and Manual described above evidence an undertaking on the part of the United States to commence rescue missions when individuals are in potential danger. The obligation imposed on the United States by these documents is clear, however; it is to handle a mission competently once it is undertaken.

[T]he decision to undertake or abandon a rescue is discretionary with the Coast Guard and other government agencies who participate in the SAR Plan. But having undertaken the rescue and engendered reliance thereon, the obligation arose to use reasonable care in carrying out the rescue.

*United States v. DeVane*, 306 F.2d 182, 186 (5th Cir.1962). See also, *United States v. Sandra and Dennis Fishing Corp*, 372 F.2d 189 (1st Cir.1967); *Frank v. United States*, 250 F.2d 178 (3rd Cir.), *cert. denied*, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1957); *Daley v. United States*, 499 F.Supp. 1005 (D.Mass.1980). With regard to the tragedy involving KAL 007, there is no allegation—and there could be none—that the United States negligently handled a mission to rescue the plane and its passengers. Because there was no affirmative undertaking by the government, Plaintiffs cannot establish a breach of duty. Failure to initiate SAR procedures is simply not actionable.

### C. *Regulation 60–1.*

#### 1. *Background*

Alaskan NORAD Region/Alaskan Air Command Regulation 60–1 entitled "Positive Control of Military Aircraft Operating Adjacent to the Soviet Union" is an internal directive to commanders of flying units, aircrews, and air surveillance operators, including the 11th Tactical Control Group which operates 13 long-range radar sites throughout Alaska to identify and track aircraft inboard to the United States.[4] Its purpose is to establish "procedures that are required to be followed as directed by the

4. The Alaskan Air Command, an Air Force major command, "trains and employs combat-ready tactical air forces to preserve the national sovereignty of the United States ..." Air Force Regulation 23–28, paragraph Ia. NORAD, the North American Aerospace Defense Command is the joint military command composed of United States and Canadian military forces which has overall responsibility for aerospace defense of the North American Continent. Air Force Regulation 23–28, paragraph 1.6(2)(a).

Commander, Alaskan NORAD Region (ANR)/Alaskan Air Command (AAC) to prevent the unintentional overflight of Soviet Union airspace by aircraft assigned to, or under the operational control of ANR or AAC." Regulation 60–1 at 1 (Feb. 2, 1982).

Only one parenthetical remark in Regulation 60–1 deals specifically with civilian aircraft. After telling the air surveillance operator to check every aircraft about to enter or initially detected in the Buffer Zone,[5] Regulation 60–1 instructs the tracker to:

> Perform normal surveillance and track reporting procedures of all aircraft detected in the buffer zone. If it looks like an aircraft is lost or may enter the Alaskan non-free flying area, try at once to reach the aircraft on GUARD or AICC (tell the nearest Federal Aviation Administration Flight Service Station for civil aircraft), and, if military, recommend possible interception.

*Id.* at 2. Plaintiffs argue that the above parenthetical phrase evidences an undertaking on the part of the United States to warn civilian aircraft in the position of KAL 007.

### 2. *Alleged Undertaking*

It is clear that Reg. 60–1 does not create an actionable duty running from the United States to the passengers of KAL 007. Lieutenant General Bruce K. Brown, Commander of the Alaskan Air Command, on August 31, September 1, 1983, testified, and it is undisputed, that Regulation 60–1 is an internal military directive issued to those under his command. He said that the parenthetical phrase in question "reflects no intent to assume responsibility to monitor or warn civilian aircraft." Affidavit at paragraph 11. The testimony of personnel working on an operational level that they believed they were required to obey Reg. 60–1 does not support Plaintiffs' contention that the United States owed a duty to Plaintiffs' decedents. Defendant nowhere disputes that as employees, government personnel owe a duty to their employer. But as the Court held in *Clemente v. United States*, 567 F.2d 1140 (1st Cir.1977) *cert denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978):

> Not all acts and orders of the United States government are so sovereign that they must be treated as commands which create legal duties or standards, the violation of which involves breaking the law. A considerable part of the government's conduct is in the context of an employer-employee relationship, a relationship which includes reciprocal duties between the government and its staff but not necessarily a legal duty to the citizenry.

*Id.* at 1144. In *Clemente*, relatives and representatives of passengers killed in a plane crash brought suit against the United States alleging that Federal Aviation Administration employees negligently failed to warn the passengers that their aircraft was overweight and lacked a proper flight crew. The Court held that an Order under the Federal Aviation Act requiring that a "clear indication of alleged illegal flight should be made known to the flight crew and persons chartering the service" did not evidence a duty running from the United States to the passengers of the flight. "[T]he agency, in issuing the order, was acting entirely gratuitously and was under no obligation or duty to plaintiffs' decedents or any other passengers," the Court stated. *Id.* The same reasoning applies here.

Plaintiffs' claim with regard to Reg. 60–1 is that the United States undertook an obligation to warn civilian aircraft in the position of KAL 007 and then failed to competently complete its mission. As discussed above, the one parenthetical phrase on which Plaintiffs rely does not indicate that the United States assumed ultimate respon-

---

5. The Buffer Zone is an area next to a non-free flying area where operations by U.S. military aircraft are restricted. It was established "to prevent unintentional overflights of the Soviet Union airspace by *military aircraft* assigned to, or under the operational control of ANR or AAC." Regulations 60–1 at 1 (emphasis added). There is no evidence that civilian aircraft may not operate there.

sibility for rescuing civilian flights. Regardless of whether there was an undertaking by the government, however, for the United States to be liable, Plaintiffs must also show either that their decedents relied on the undertaking or that the government's incompetence worsened the position of the aircraft. (This standard, which is set forth in Restatement (second) of Torts, §§ 323, 324A, has been accepted by the Federal Courts and both Plaintiffs and Defendant agree that it applies).[6] There is no evidence that anyone aboard KAL 007 relied on the regulation. General Brown stated that to his knowledge the internal directive was never disseminated outside the air force. Affidavit at paragraph 15. As for the worsening of KAL 007's position, Plaintiff's allege that the government's inaction increased the possibility of the plane being shot down. If this were enough to place liability on the United States, however, the analysis regarding worsening of position would become meaningless. Courts look for worsening of position to determine whether defendants have affirmatively injured plaintiffs or have caused others not to act because they relied on the defendants' competence. It is clear in this case that the United States did not aggravate KAL 007's course deviation and therefore it cannot be held liable to plaintiffs even if Reg. 60-1 were considered an undertaking on its part to warn civilian aircraft.

## II. *Foreseeability and Superseding Cause*

■ Even if Plaintiffs had established that the United States had a legal duty to warn or advise civilian aircraft in the position of KAL 007, to recover damages Plaintiffs would also have to prove that the intentional attack by the Soviets was within the foreseeable consequences of a breach of that duty. Similarly, for Plaintiffs to prevail, the Soviet action could not have operated as an independent, superseding cause of the deaths of the passengers.

On August 2, 1985, this Court resolved the same issues involved here in favor of Defendants Boeing Company and Litton Systems, holding that:

> [T]he Soviet action of firing upon an unarmed commercial airplane over the Sea of Japan, knowing that this would inevitably result in loss of life of all persons on board was, at the least, a deviation from accepted international norms, or, at the most, all that it has been characterized to be by our government. What it was not is "expected," or, in the language of the law, "foreseeable."

Memorandum at 18–19 (citing Pub.L. No. 98–98, 97 Stat. 715 (1983)). Because Plaintiffs have presented no new evidence to establish that Defendant United States should have foreseen the downing of the plane or the deaths of its passengers any more clearly than the other defendants, the reasoning of that opinion is fully applicable here and shall not be repeated. There is nothing to warrant a change in our determination that "the Soviet Union's action toward KAL 007 was sufficiently independent and intervening to constitute "superceding cause" as a matter of law." *Id.* at 16.

---

6. § 323. Negligent Performance of Undertaking to Render Services
   One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
   (a) his failure to exercise such care increases the risk of such harm, or
   (b) the harm is suffered because of the other's reliance upon the undertaking.
   § 324A. Liability to Third Person for Negligent Performance of Undertaking
   One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to third persons for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
   (a) his failure to exercise reasonable care increases the risk of such harm, or
   (b) he has undertaken to perform a duty owed by the other to the third person, or
   (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

**36**

## CONCLUSION

There are no discernible circumstances under which Plaintiffs in these cases could prevail against the United States. The record is clear that the government breached no duty to the passengers of KAL 007. Furthermore, any duty the United States may have had toward Plaintiffs' decedents would not extend to the unforeseeable, tragic consequences of this disaster. Finally, the Soviets' unnecessary act of aggression against KAL 007 was a superceding cause of harm insulating the United States from any liability. For all of the above reasons, the United States must prevail as a matter of law.

An appropriate Order accompanies this Memorandum.