**Fred WYLER, Individually and as a Personal Representative of the Estate of William Paul Wyler, Deceased, for the Benefit of Himself and Helen C. Wyler, et al., Appellants,**

v.

**KOREAN AIR LINES COMPANY, LTD., et al.**

Nos. 86–5400, 86–5401, 86–5403 to 86–5413, 86–5415 to 86–5427, 86–5429, 86–5431, 86–5515 to 86–5524, 86–5562, 86–5596, 87–5016, 87–5091 and 87–5263.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1991.

Decided March 29, 1991.

As Amended April 3, 1991.

See also 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113.

Steven R. Pounian, with whom Milton G. Sincoff, New York City, Donald W. Madole, George E. Farrell and Juanita M. Madole, Washington, D.C., were on the brief, for appellants in 86–5400, 86–5401, 86–5403 to 86–5413, 86–5415 to 86–5427, 86–5429, 86–5431, 86–5515 to 86–5524, 86–5562, 86–5596, 87–5016, 87–5091 and 87–5263. Ned Good, Pasadena, Cal., also entered an appearance, for appellants.

Irene M. Solet, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Robert S. Greenspan and Lori M. Beranek, Attys., Dept. of Justice, Washington, D.C., were on the brief, for the Federal appellees in 86–5400, 86–5401, 86–5403 to 86–5413, 86–5415, 86–5416, 86–5424, 86–5427, 86–5429, 86–5431, 86–5515 to 86–5524, 86–5562, 86–5596, 87–5016 and 87–5263.

George N. Tompkins, Jr. and Desmond T. Barry, Jr., New York City, were on the brief, for appellees, Korean Air Lines Co., Ltd., et al., in 86–5400, 86–5401, 86–5403 to 86–5412, 86–5415 to 86–5423, 86–5425, 86–5426, 86–5515 to 86–5524, 86–5596 and 87–5091.

Before MIKVA, Chief Judge, BUCKLEY and THOMAS, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

On September 1, 1983, a Korean Air Lines ("KAL") Boeing 747 airliner was shot down somewhere over the Sea of Japan by one of the Soviet Union's military aircraft, killing all 269 persons on board. The flight recorders and most of the wreckage were never recovered, so the exact details of what happened remain a mystery. Numerous wrongful death suits were filed against various defendants including KAL and the United States. The suits were consolidated in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1407 (1988). Before trial, the district court dismissed several claims against KAL for lack of subject matter jurisdiction and granted summary judgment for the United States on claims that it had breached a duty to warn. At trial, the remaining plaintiffs won a jury verdict and received a judgment including $50 million in punitive damages, which is challenged in a separate appeal. In this appeal, we affirm both pre-trial decisions by the district court.

I. BACKGROUND

On August 31, 1983, Korean Air Lines Flight 007 ("KE007") left New York's Kennedy Airport bound for Seoul, South Korea, with a stop in Anchorage, Alaska. After refueling there, KE007 took off from Anchorage International Airport at 1300 Greenwich Mean Time ("G.M.T."), or 4:00 a.m. local time. The Anchorage Air Traffic Control ("ATC") Center instructed KE007 to climb and maintain a flight level of 33,-000 feet and "proceed direct BETHEL when able." BETHEL, located approximately 360 nautical miles west of Anchorage, is the navigational gateway for Route R20 of the North Pacific Composite Route System, which operates like a multi-lane highway for civilian flights across the Pacific Ocean between North America and Asia. BETHEL also serves as a navigational waypoint at which an airplane can cross-check its position against a radio fix. Route R20 has a series of navigational waypoints with precise geographical coordinates, each about 300 miles apart, that KE007 was expected to follow on a direct path and use for course verification and reporting. (These waypoints were designated BETHEL, NABIE, NUKKS, NEEVA, NINNO, NIPPI, NYTIM, NOKKA, and NOHO.) Anchorage ATC transfers control of aircraft following Route R20 to Tokyo Center at waypoint NIPPI.

At the time that these events took place, Anchorage ATC had radar coverage for less than half the distance to BETHEL. The Federal Aviation Administration's ("FAA") Kenai radar installation provided coverage as far as Cairn Mountain, approximately 165 nautical miles west of Anchor-

age. The air traffic controller in charge of the first leg of the flight maintained radar surveillance of KE007 up to Cairn Mountain, and then informed the crew that "radar services terminated." From that point on, Anchorage ATC would rely on the crew's position reports (calculated in-flight with the help of the waypoints and onboard systems such as the Inertial Navigation System ("INS")) to track KE007's location and adherence to R20. Approximately 22 minutes after passing out of ATC radar coverage, KE007's pilot reported reaching BETHEL.

During the remainder of the flight, KE007 continued to report having reached each successive waypoint up to NIPPI, when Anchorage transferred control to Tokyo. Several of these reports were relayed to Anchorage ATC by another KAL flight, KE015, which had departed Anchorage shortly after KE007 and also was following R20. The air traffic controllers testified that they did not find this practice unusual. At 1432 G.M.T., one controller apparently tried to raise KE007 shortly before it was scheduled to reach waypoint NABIE. His repeated efforts were unsuccessful, but a few minutes later a report was relayed by KE015 that KE007 had reached NABIE. After BETHEL, the only direct transmission from the KE007 crew to ground controllers was a report to Tokyo that the plane was rapidly decompressing.

Plaintiffs' liability claims in all of these actions grow from a hypothetical flight deviation that was allegedly apparent on FAA radar shortly after take-off and could be extrapolated across the entire route to the approximate crash site in the Sea of Japan (after flying for about three hours in Soviet airspace and crossing over the Kamchatka Peninsula and Sakhalin Island). Plaintiffs argue that the crew's location reports were fabricated to cover up an error in programming the INS in Anchorage. The validity of this postulated flight path, and the permissibility of inferences drawn therefrom concerning the crew's conduct, are treated in more detail in the district court's opinion denying KAL's motion for partial summary judgment. *See In re Korean Air Lines Disaster of September 1, 1983,* 704 F.Supp.

1135, 1136–51 (D.D.C.1988). For present purposes, we can assume that the course deviation did occur as plaintiffs suggest, because the government did not dispute this factual claim in its motion for summary judgment.

In their claims against the United States, plaintiffs alleged that the government knew that KE007 was proceeding off course and should have warned the crew that they were straying into Soviet airspace. In particular, plaintiffs argue that U.S. Air Force personnel would have seen the course deviation on military radar and were under a duty to advise Anchorage ATC. Shortly after the suits were consolidated, the United States moved to dismiss or, in the alternative, requested summary judgment. The district court dismissed several of the claims, but denied the motion for summary judgment on the duty to warn issue because "plaintiffs had not yet had time to take discovery." *In re Korean Air Lines Disaster of September 1, 1983,* 597 F.Supp. 613, 618 (D.D.C.1984) (allowing discovery concerning "the existence of a legal duty to warn or advise civilian aircraft in the position of KAL 007"). More than a year later, the court granted the government's renewed motion for summary judgment. *See In re Korean Air Lines Disaster of September 1, 1983,* 646 F.Supp. 30 (D.D.C.1986) (hereinafter *"In re KAL Disaster"*). In the interim, the district court also dismissed several claims against KAL for lack of subject matter jurisdiction under Article 28(1) of the Warsaw Convention. *See* Orders and Memorandum Opinion (D.D.C. July 25, 1985) (hereinafter "Mem.Op.").

## II. ANALYSIS

### A. *Claims against the United States*

In their claims against the United States, plaintiffs alleged that the government knew or should have known that KE007 was proceeding off course and that it should have warned the crew of their deviation into Soviet airspace. In granting the government's motion for summary judgment, the district court held that the plain-

tiffs had failed to establish that any U.S. employee, except the air traffic controllers monitoring KE007's position reports, had a duty to warn civilian aircraft under such circumstances. The court rejected plaintiffs' argument that a brief parenthetical phrase in an internal United States Air Force ("USAF") directive created a duty on the part of Air Force personnel to monitor outbound civilian aircraft on radar and warn of any course deviations, adding that KAL's passengers and crew had not relied on this alleged undertaking anyway. The court also found that there was no triable factual dispute concerning a breach of duty by either the FAA air traffic controllers or the USAF trackers, declining to draw any adverse inference against the government from its inability to submit the radar tapes for that night because of their routine reuse. Lastly, the court held that even if the United States had breached a duty, the deliberate and unlawful act by the Soviet Union was unforeseeable and therefore constituted an independent, superseding cause of the disaster. Because we agree that there was no breach of a legal duty by the government, we do not address the district court's somewhat more troubling foreseeability analysis.

At the outset, the government insists that appellants have impermissibly merged the duties of different agencies to contend that the United States generally had a duty to track KAL on military radar and warn it in case it strayed into or near Soviet airspace. It argues that Air Force "trackers" monitoring military radar in Alaska are in no sense like air traffic controllers. The military maintains several radar installations in Alaska as part of the North American Aerospace Defense Command ("NORAD") which provide more extensive coverage than the FAA radar in Anchorage. In 1983, these sites included antennas at King Salmon, Cape Newenham and Cape Romanzof, which together covered an area at least from Cairn Mountain to 200 miles out over the North Pacific Ocean. Air Force personnel assigned to the Regional Operations Control Center ("ROCC") at Elmendorf Air Force Base in Anchorage monitor military radar for aircraft entering into the Alaskan NORAD region primarily to defend against military threats.

According to appellants, the USAF radar trackers at ROCC would have seen KE007 on their scopes on its postulated course deviation, but testimony from the trackers on duty that morning suggests that nothing unusual was seen. ROCC automatically records radar data, but tapes from Cape Newenham and Cape Romanzof apparently were erased according to a normal recycling routine. (Appellants suggest that the tapes were intentionally destroyed, but they were unable to discover anything that would undermine the government's explanation.) Appellants also contend that the government had a general duty to monitor and warn, suggesting that the knowledge supposedly available to the USAF trackers could be imputed to the government as a whole so as to trigger the FAA's undoubted duty to transmit such course information to KE007. There is, however, no basis for holding "the United States liable based upon the collective knowledge of its employees." One federal agency "should not be charged with knowledge of what another is doing simply because both are components of the same federal government." *J.A. Jones Constr. Co. v. United States,* 390 F.2d 886, 891 (Ct.Cl.1968); *see also United States v. Currency Totalling $48,-318.08,* 609 F.2d 210, 215 (5th Cir.1980) (knowledge of customs agent not attributed to government because claimant could not prove that agent had a duty to reveal knowledge).

Appellants' reliance on *In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984), *aff'd,* 818 F.2d 145 (2d Cir.1987), is misplaced. In that case, the district court observed that "the knowledge of employees of one agency may be imputed to those of another if there is some relationship between the agencies." 597 F.Supp. at 796. The court found that, because numerous government agencies and employees knew of the possible risks associated with dioxin, this widespread knowledge could be imputed to the government as a whole for purposes of finding that the private defendants had a

valid government-contractor defense. *See id.* at 795–99. In this case, by contrast, the Air Force and FAA have clearly delineated duties vis-a-vis control of military and civilian aircraft respectively, and there is no basis for holding the government liable for failure to warn a civilian aircraft if the Air Force knew of the course deviation but the FAA did not. Indeed, even within FAA, imputation of knowledge between different agency operations may not be justified: "[T]he duties of [FAA] air controllers and the procedures that govern them are not analogous to other facets of the FAA operations or the work of other federal agencies." *Clemente v. United States,* 567 F.2d 1140, 1147 n. 10 (1st Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). Therefore, we must separately analyze the legal duties of the USAF trackers and the FAA controllers.

### 1. Alleged Breach of Duty by U.S. Air Force Personnel

■ It is well settled that "one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *Indian Towing Co. v. United States,* 350 U.S. 61, 64–65, 76 S.Ct. 122, 124–25, 100 L.Ed. 48 (1955) (holding that negligent operation of a lighthouse by the Coast Guard is actionable under the Federal Tort Claims Act); *see also Patentas v. United States,* 687 F.2d 707, 714–15 (3d Cir.1982) (admiralty case). The government contends that both elements of this doctrine are missing here: there was no undertaking by the Air Force to warn, and, even if there had been, KAL's passengers and crew did not rely on it. The district court accepted both arguments. *See In re KAL Disaster,* 646 F.Supp. at 33–35.

Appellants' only basis for alleging that the trackers had a duty to warn appears in an internal USAF directive entitled "Positive Control of Military Aircraft Operating In Airspace Adjacent to the Soviet Union." Regulation 60–1, Alaskan NORAD Region ("ANR")/Alaskan Air Command ("AAC"). The stated purpose of the directive is "to prevent unintentional overflight of Soviet Union airspace by aircraft assigned to, or

under the operational control of ANR or AAC." The Regulation creates two restricted zones in or adjacent to Soviet airspace: the Alaskan "Non–Free Flying Area" (covering airspace over and immediately adjacent to the Soviet Union), and the somewhat less restricted Alaskan "Buffer Zone" (adjacent to the Non–Free Flying Area) which was "set up to prevent unintentional overflights of Soviet Union airspace by military aircraft...." Plaintiffs rely on subsection 3(c), which instructs radar trackers to:

(1) Check every aircraft about to enter or initially detected in the Alaskan Buffer Zone for a mode II or mode IV SIF code [transponder codes used exclusively by military aircraft]. If a military aircraft is about to enter or is detected in the Buffer Zone, try at once to reach the aircraft....

(2) Perform normal surveillance and track reporting procedures of all aircraft detected in the Buffer Zone. If it looks like an aircraft is lost or may enter the Alaskan non-free flying area, try at once to reach the aircraft on GUARD or AICC [radio frequencies monitored by military airplanes] (tell the nearest Federal Aviation Administration Flight Service Station for civil aircraft)....

Regulation 60–1, § 3(c).

Appellants argue that this regulation creates an actionable duty running from the U.S. Air Force to the passengers of KE007. However, internal government directives that may benefit the public do not necessarily create duties to third persons. *See, e.g., Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981); *Jacobo v. United States,* 853 F.2d 640, 641–42 (9th Cir.1988). For example, the First Circuit rejected survivors' claims against the FAA based on an agency order to its ground personnel requiring that a "[c]lear indication of alleged illegal flight [e.g., excess weight] should be made known to the flight crew and persons chartering the service." *Clemente,* 567 F.2d at 1143 n. 3. In that case, the court decided that the duty [this order] creates is that of the District Office employees to perform

their jobs in a certain way as directed by their superiors. This duty ... is owed by the employees to the government and is totally distinguishable from a duty owed by the government to the public on which liability could be based.

*Id.* at 1144–45. Appellants distinguish *Clemente* because the FAA ground personnel were not controllers, but the USAF trackers are not controllers either. Furthermore, they are wholly independent of the FAA.

■ Appellants next seek to invoke a more amorphous special relationship (between the government and passengers) to impose a duty of care on the USAF trackers. This is also unavailing because, although a special relationship may expand the scope of an existing duty or undertaking, a legal duty cannot arise in the absence of any undertaking by the defendant to perform some role that relates to the safety of the passengers. An undertaking by the FAA to provide air traffic control services does not mean that USAF trackers have a special relationship with passengers to assure their safety. Appellants rely on this court's decision in *Caldwell v. Bechtel*, 631 F.2d 989 (D.C.Cir.1980), which held that a firm's contractual undertaking with the Washington transit authority to perform safety engineering services at a subway construction site created a special relationship with employees at the site. In *Caldwell*, we decided that, because of this special relationship, a failure to advise employees of a toxic condition which had been reported to the transit authority was actionable. In a subsequent decision, we described the holding in *Caldwell* as "designat[ing] the contract as the duty's source." *Long v. District of Columbia*, 820 F.2d 409, 418 (D.C.Cir.1987). Unlike the engineering firm in *Caldwell*, the Air Force has made no undertaking with FAA to advise either ATC or civilian flights about course deviations, and therefore it does not stand in a special relationship with passengers of such flights.

The district court also concluded that, even if there had been an undertaking by the government to warn, neither the crew nor the passengers of KE007 relied on that undertaking or were otherwise placed in a worse position. *See In re KAL Disaster*, 646 F.Supp. at 35. Indeed, the map used by the KE007 crew did not indicate the location of the ANR/ACC Buffer Zone; the crew was advised by the FAA that radar contact had terminated while they were still over Alaska; and neither the crew nor passengers would know about Regulation 60–1 because it had never been made public. Appellants' sole response is that passengers generally rely on the government to assure their safety, but this simply reiterates their special relationship contention and does not prove that the passengers or crew relied on Regulation 60–1. *Contrast Beattie v. United States*, 690 F.Supp. 1068, 1072–74 (D.D.C.1988) (Although the U.S. Navy had no legal duty to furnish air traffic control services to civilian flights over the Antartic, the government could be held liable for any failure to exercise care in providing such services if "Navy personnel led the crew of the aircraft to believe that certain services would be forthcoming.").

■ Even if Regulation 60–1 creates a duty, it does not, as appellants suggest, require trackers to notify the FAA any time they monitor a civilian flight that appears to be headed towards Soviet airspace or the Buffer Zone; rather, it requires notification only in cases where the flight is already detected in the Buffer Zone and appears to be lost or heading into the Non–Free Flying Area. Even assuming that plaintiffs' projected flight path for KE007 was the actual one, the flight would have entered the Buffer Zone at the outermost range of the closest Air Force radar installation assuming optimum conditions. It was not at that point heading into the Non–Free Flying Area. Furthermore, the government emphasizes the lack of any facts to indicate that the USAF trackers were aware of the flight deviation, and points to statements by the trackers on duty that night saying they did not observe any traffic flying into the Buffer Zone.

■ Appellants argue that an adverse inference on this issue against the government is appropriate because it "destroyed"

the radar tapes of that night. *See, e.g., Friends for All Children v. Lockheed Aircraft Corp.,* 587 F.Supp. 180, 189 (D.D.C.) (suggesting that Air Force destruction of crash photos would create adverse inference against the government if it were a party), *modified,* 593 F.Supp. 388 (D.D.C.), *aff'd,* 746 F.2d 816 (D.C.Cir.1984). The cases cited by appellants all involved the withholding or destruction of evidence after a discovery order was entered, while here the government insists that the recycling of radar tapes was routine. Appellants contend that the government should have known not to recycle these tapes in light of the disaster. Mere innuendo, however, does not justify drawing the adverse inference requested, and there is absolutely no other evidence supporting appellants' claim that the Air Force radar trackers must have seen KE007 in the Buffer Zone. Therefore, even if they owed KE007 a duty to monitor and warn, we agree that no duty was breached by the Air Force in this case.

### 2. Alleged Breach of Duty by FAA Air Traffic Controllers

■ Although the government does not deny that ATC should have relayed a warning to KE007 had it been advised by the USAF trackers of a deviation, it points out several inaccuracies in appellants' description of ATC duties. Contrary to the appellants' description of FAA regulations, "safety advisories" are only required in cases where the aircraft is too close to the ground or another aircraft, "deviation advisories" are only called for when still in radar contact, and advisories to Soviet controllers are only called for in hijacking incidents. Having made those clarifications, the government argues that there was no evidence at all that the USAF trackers advised the air traffic controllers of any deviation.

The government argues that, even if the USAF trackers discovered KE007's course deviation, the air traffic controllers were never advised of it, so they could not have breached any duty to the passengers. Appellants contend that a telephone call was received at ATC, although they have no evidence for this other than an inaudible recording of noise at ATC, and the government introduced sworn statements that no such call was either made or received. Appellants introduced an affidavit by Raymond Yeager, a former FAA accident investigator, which concluded that the audio tape disclosed the words "we should warn him." Even if discernible, there is no indication who said this or whether they were referring to KE007. Appellants make much of the fact that these words were allegedly spoken during the course of repeated attempts by the controller then in charge of KE007 to raise the crew by radio. But the government introduced a sworn statement by this controller explaining that he routinely checked with flights just before they were scheduled to arrive at their next waypoint, but something was preventing a direct broadcast in this case.

Thus, the submissions to the district court on the motion for summary judgment were bereft of any evidence that would support appellants' claim that either the USAF trackers or FAA air traffic controllers were ever made aware of KE007's purported course deviation. On this record, the district court properly decided that no legal duty was breached. We need not and do not reach the question of whether the Soviet Union's illegal intercept was unforeseeable and constituted a superseding cause.

### B. *Treaty Jurisdiction under Article 28(1)*

■ In ten of the actions on appeal, the district court dismissed the claims of passengers who bought their tickets for KE007 at locations outside of the United States. *See* Mem.Op. (rejecting arguments that the U.S. was an appropriate forum either because KAL conducted significant business there or because it was a place of destination). Subject matter jurisdiction in the actions against KAL is governed by the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929 (the Warsaw Convention), which the United States joined in 1934. *See* 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* 49 U.S.C. App. § 1502,

note. Article 28(1) of the Warsaw Convention provides:

An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.

Failure to satisfy at least one of these jurisdictional conditions requires dismissal. *See Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1104 (D.C.Cir.1988). The sole issue on appeal from the district court's decision concerns the proper interpretation of the term "domicile" in Article 28(1).

Courts in this country have routinely assumed that the French phrase *"du domicile du transporteur"* in Article 28(1) means the carrier's place of incorporation, which in this instance is Korea. *See Smith v. Canadian Pacific Airways, Ltd.*, 452 F.2d 798, 802 (2d Cir.1971); *Eck v. United Arab Airlines, Inc.*, 360 F.2d 804, 809 (2d Cir.1966). Scholars of comparative law have observed that domicile generally refers to a corporation's headquarters. *See, e.g.*, N. MATTE, TREATISE ON AIR-AERONAUTICAL LAW 426–27 (1981). Appellants argue that *"domicile"* also means any place where the carrier conducts substantial business activities, which KAL does in the United States. Appellants contend that French domestic law, which has a much broader notion of domicile (akin to minimum contacts for purposes of personal jurisdiction), should govern the interpretation of Article 28(1), and they add that U.S. decisions to the contrary have failed to appreciate the French concept. However, the French definition of *"domicile"* that would encompass any place of significant business is only relevant for questions of personal jurisdiction within France. Even the French courts have recognized the distinction, refusing to construe Article 28(1) in this manner. *See, e.g., Zimonyl v. Varig Airlines*, 1978 U.S. Aviation Rpts. 122, 125 (France, Court of First Instance of Paris, 1st Div., Sec. 2, Apr. 28, 1978). Moreover, to do otherwise would effectively render other parts of Article 28(1) redundant; if domicile means any place of substantial business, there would be no need to separately allow suit at the carrier's principal place of business or, except in rare cases, place where a ticket was purchased.

### III. CONCLUSION

In granting summary judgment to the United States, the district court properly found that the government had not breached any legal duty owed to the passengers of KE007. The court also acted correctly in dismissing the claims against KAL on subject matter grounds because we interpret the term *"domicile"* in Article 28(1) of the Warsaw Convention as a corporation's headquarters and not any place that it does significant business.

Affirmed.